RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

<table>
<tr><td>

NILRATAN JAVERY,

         *Plaintiff-Appellant*,


    *v.*


LUCENT TECHNOLOGIES, INC. LONG TERM
DISABILITY PLAN FOR MANAGEMENT OR LBA
EMPLOYEES,

         *Defendant-Appellee.*

</td><td>

No. 12-3834

</td></tr>
</table>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:09-cv-00008—Gregory L. Frost, District Judge.

Argued: December 3, 2013

Decided and Filed: February 3, 2014

Before: COLE and CLAY, Circuit Judges; BERTELSMAN, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Worthington, Ohio, for Appellant. James M. Stone, JACKSON LEWIS LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Tony C. Merry, LAW OFFICES OF TONY C. MERRY, LLC, Worthington, Ohio, for Appellant. James M. Stone, Daniel L. Messeloff, Michelle T. Hackim, JACKSON LEWIS LLP, Cleveland, Ohio, for Appellee.

———————————

## OPINION

———————————

CLAY, Circuit Judge. Plaintiff Nilratan Javery appeals the judgment of the district court in favor of Defendant, Lucent Technologies, Inc. Long Term Disability

———————

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Plan for Management or LBA Employees ("the Plan"), denying Plaintiff's claim for disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Plaintiff contends that the Plan wrongfully denied his application for long term disability benefits. In support of his claim, Plaintiff submitted opinions and evaluations from several medical doctors and psychiatrists, the majority of whom assert that Plaintiff was unable to perform his job as a result of his physical and mental illnesses. Plaintiff also offered other evidence including his successful application for Social Security disability benefits to show that he was "disabled" as that term is defined in the Plan. Defendant argues that Plaintiff has not established by a preponderance of the evidence that he was "disabled" at the relevant time. Additionally, Defendant contends that Plaintiff should be judicially estopped from pursuing his ERISA claim because Plaintiff failed to disclose the claim in his Chapter 13 personal bankruptcy action.

On appeal, Plaintiff requests this Court, on *de novo* reveiw, to reverse the order of the district court denying Plaintiff long term disability benefits. For the reasons set forth below, we **REVERSE** the order of the district court, and **REMAND** to the district court with instructions that the district court enter judgment in favor of Plaintiff on the administrative record.

## BACKGROUND

Plaintiff began working for Lucent Technologies, Inc. ("Lucent") as a software engineer in 1998. As an employee of Lucent, Plaintiff was a participant in Lucent's ERISA qualified welfare benefit plan: the Lucent Technologies Inc. Long Term Disability Plan for Management or LBA Employees ("the Plan"). The Plan offers long term disability benefits to participants who meet its defined requirements for eligibility. Lucent delegated the Plan's administration to a third party, Connecticut General Life Insurance Company ("CIGNA" or "the plan administrator").

Plaintiff's job as a software engineer required him to sit continuously for eight to ten hours each day. Plaintiff reported that the work was "fast-paced and it involved

supporting [Lucent] employees and several consultants round the clock . . . . in excess of 70–75 hours per week over 5–6 months straight." (Admin. R. 556)  It was also a technically and intellectually demanding job which required knowledge of "[s]oftware based tools: Progress and Oracle database, Unix Operating system, Unix based 4GL languages such as awk, shell, scripting, perl." (Admin. R. 521)

In early November 2002, Plaintiff first reported experiencing back pain.  His family doctor, Dr. Dorado, prescribed medicine and additional testing, and recommended that Plaintiff take some time off work.  Plaintiff took two weeks off in November 2002, and then returned to work at Lucent.  In January 2003, after Lucent transferred Plaintiff from Ohio to Illinois, Plaintiff sought treatment from another physician, Dr. Jay Seymour.  Plaintiff's lower back pain worsened.  In May 2005, Dr. Seymour advised Plaintiff to stop working.  Plaintiff stopped working on May 19, 2005.

Lucent approved and paid short term disability benefits from May 19, 2005 until those benefits expired on November 25, 2005.  Lucent then notified the plan administrator that it believed Plaintiff might be eligible for long term disability benefits under the Plan.  The plan administrator contacted Plaintiff and invited him to apply for long term disability benefits.

Under the terms of the Plan, a participant is entitled to receive a monthly disability benefit from the Plan if he or she is "disabled," which the Plan defines as follows:

> The term "Disability" or "Disabled" shall mean, for the one year period commencing immediately after the 26 weeks of Short Term Disability Benefits have been paid, that the Eligible Employee is prevented by reason of such disability, other than accidental injury arising out of and in the course of employment of the Company, from engaging in his or her occupation or employment at the Company, for which the eligible employee is qualified, based on training, education or experience. Thereafter, an Eligible Employee shall continue to be considered as disabled under the Plan if, in the sole opinion of the Claims Administrator, the Eligible Employee is determined to be incapable of performing the requirements of any job for any employer (including non-

[Lucent] employment), (as a management or LBA employee), for which the individual is qualified  or may reasonably become qualified by training, education or experience, other than a job that pays less than 60% of the Eligible Employee's Eligible Pay that would have been in effect on the day preceding the day that the Eligible Employee's Short Term Disability Benefits ceased.

(Admin. R. 005)

We note at the outset that only the first definition is relevant to our resolution of the present case: Plaintiff is entitled to disability benefits if he was "prevented by reason of . . . disability . . . from engaging in [his] occupation or employment at [Lucent]."  As discussed below, when Plaintiff submitted his application for long term disability benefits on or about November 25, 2005, the plan administrator evaluated Plaintiff's eligibility for benefits "for the one year period commencing immediately after the 26 weeks of Short Term Disability Benefits have been paid," and denied Plaintiff's application.  Though this case has a complicated procedural history, the dispute at the heart of the matter is whether or not the plan administrator's denial of Plaintiff's application at that time was proper.  In other words, notwithstanding the fact that it is now 2014, the relevant time period is still November 25, 2005 through November 25, 2006, and the relevant inquiry is whether Plaintiff was unable to work as a software engineer at that time.[1]

Plaintiff submitted his application for long term disability benefits on or around November 25, 2005.  In his application, he described his disability as follows:

[A]t work I have suffered severe aggravation to my degenerative diseased disc at L4-L5 and L5-S1. This degeneration is progressing and

---

[1]Because the plan administrator denied Plaintiff disability benefits in the first instance, the plan administrator never made a determination regarding Plaintiff's "continued" disability.  Accordingly, Plaintiff's eligibility for disability benefits after November 25, 2006 is not an issue before this Court.  In light of our decision in this case, we expect that the plan administrator will be asked to make such a determination in the near future.

In addition, although Plaintiff has submitted evidence of his medical condition beyond November 25, 2006, we only consider such evidence to the extent that it speaks to Plaintiff's condition during the relevant time period.  The primary benefit of such evidence in evaluating Plaintiff's condition during the relevant period is that the post-2006 evidence speaks to the credibility and accurateness of the earlier evaluations and opinions.  In considering the post-2006 evidence, we are mindful that Plaintiff may only prevail by establishing that he was unable to work as a software engineer between November 25, 2005 and November 25, 2006.

causing increased pain. So much so that I am unable to sit and perform basic physical and mental activities due to extreme back pain. . . . Medications and intense back pain prevents me physically and mentally to continue performing timely and quality work.

(Admin. R. 519) Plaintiff stated that he could "not even imagine delivering any commercial grade work as [he is] always in pain and quite disoriented." (Admin. R. 520) Along with his application, Plaintiff submitted a great deal of medical evidence from various medical professionals, including:

- Attending Physician Statement by Dr. Jay Seymour, dated November 22, 2005. Dr. Seymour assigned Plaintiff a Class 5 physical impairment rating ("[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity"), and indicated that Plaintiff was "unable to sit, on multiple meds for this." (Admin. R. 509) Dr. Seymour also assigned Plaintiff a Class 5 mental impairment rating ("significant loss of psychological, physiological, personal and social adjustments (severe limitations)"). Dr. Seymour concluded that Plaintiff was "totally disabled" from his regular work at Lucent, with or without restrictions, and that it "will take a lot of time and treatment" for Plaintiff to improve. He predicted that it would take at least 6 months for Plaintiff to recover. Dr. Seymour also indicated that Plaintiff would not be a suitable candidate for trial employment at Lucent or any other job because he was "not physically/emotionally/cognitively ready for work."

- Physical Ability Assessment by Dr. Seymour, dated December 30, 2005. Dr. Seymour wrote: "[Plaintiff] denies ability to do these [physical activities] throughout the day. I am concerned with the amount of pain meds he is taking and his cognitive/emotional ability to work." (Admin. R. 489)

- Notes from Dr. Seymour, dated November 7, 2005. Following a medical examination, Dr. Seymour expressed concerns about Plaintiff returning to work because of all the medications he was on, but opined that a return to work would be the "best thing" for Plaintiff. (Admin. R. 312) Dr. Seymour also noted that, although Plaintiff sat for nearly an hour during the examination, he showed no signs of pain or distress throughout the examination.

- Healthcare Provider's Report by Dr. Seymour, dated June 15, 2005. Dr. Seymour indicated that Plaintiff "cannot sit for 5 minutes in chair without severe pain. Pain w/ walking/standing at all times." (Admin. R. 350–51)

- Attending Physician Statement by Dr. Brian Holtzmeier, dated November 28, 2005. Dr. Holtzmeier assigned Plaintiff a Class 5 physical impairment rating ("[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity"), and indicated that Plaintiff must avoid prolonged sitting. Dr. Holtzmeier also assigned Plaintiff a Class 5 mental impairment rating

("significant loss of psychological, physiological, personal and social adjustments (severe limitations)"). Dr. Holtzmeier concluded that Plaintiff was "totally disabled" from his regular work at Lucent, with or without restrictions, and that Plaintiff would not be a suitable candidate for trial employment at Lucent or any other job because of "severe pain in back." (Admin. R. 511)

• Physical Ability Assessment by Dr. Brian Holtzmeier, dated January 17, 2006. Dr. Holtzmeier indicated that Plaintiff could not tolerate sitting, standing, or walking, even with positional changes and meal breaks, for more than 2.5 hours.

• Notes from Dr. Holtzmeier from several visits in October 2005 and November 2005. On October 4, 2005, Dr. Holtzmeier referred Plaintiff to a neurosurgeon and to pain management. On October 26, 2005 and November 14, 2005, Dr. Holtzmeier noted that Plaintiff's pain was not getting any better.

• Magnetic Resonance Imaging ("MRI") of Plaintiff's thoracic and lumbar spine taken on August 8, 2005. The test found "moderate to severe degenerative change seen of the visualized lower cervical spine," "degenerative change seen at the L4-L5 and L5-S1," with "diffuse disc bulge" at L4-L5, and "degenerative change . . . with a posterior annular fissure / tear" at L5-S1. However, the physician noted that there was "[n]o significant pathology in the thoracic region."

• Healthcare Provider's Report by Dr. Enrique Saguil, dated May 25, 2005. Dr. Saguil found that Plaintiff had a "limited range of motion [and] severe muscular spasms," and would require functional limitations or restrictions for at least three months. (Admin. R. 344) Dr. Saguil prescribed physical therapy, which Plaintiff attended.

• Progress Summary from Athletic and Therapeutic Institute Physical Therapy Center, dated May 26, 2005, indicating Plaintiff's "fair" commitment to physical therapy and minimal progress in the program. The physician indicated that Plaintiff's prognosis was "same" (as opposed to "better" or "worse"), that Plaintiff had attended nine therapy sessions, and that there was "minimal change in [Plaintiff's] subjective reports." (Admin. R. 383)

• Physical Therapy Evaluation from WCS occupational rehabilitation, dated June 7, 2005, indicating that Plaintiff reported to have participated in physical therapy for four weeks, with no relief in reported symptoms, and that Plaintiff reported to be "in horrific constant pain that begins with his lower back and progresses upwards . . . . (8/10 on subject pain index where 0= no pain and 10=worst pain)." (Admin. R. 352–58)

• List of Plaintiff's prescribed medications at the time of his application for long term disability benefits: Lidoderm; Tizanidine; Etodolac; Carisoprodol; Ambien; Provigil; Metoformin ER; Mirapex; Requip; Vytoin; Altace.

- Report from Independent Medical Examination ("IME") by neurologist Gary Skaletsky on July 26, 2005. Dr. Skaletsky indicated that "[t]here is no neurologic involvement" with Plaintiff's back pain, but expressed "concern[] that there is a strong psychogenic input to the symptoms." (Admin. R. 274–77)

On February 9, 2006, a nurse care manager employed by the plan administrator reviewed the medical evidence that Plaintiff submitted in support of his application. Based on his review of the file, and in spite of documentation from two of Plaintiff's treating doctors saying that Plaintiff was unable to work and statements from others as to Plaintiff's severe limitations, the nurse care manager concluded that Plaintiff "should be able to perform his sedentary occupation." *Appellee Br.* at 6. The plan administrator denied Plaintiff's claim on February 17, 2006, stating in part:

> The medical evidence in your claim file was reviewed by one of our Nurse Case Managers on staff. While we respect the opinion of all medical providers, and we are not denying that you may experience back pain, a review of the physical medicine evidence available in the file was not consistent with your inability to work throughout your entire Benefit Waiting Period.

(Admin. R. 219) In addition, the denial letter specifically referenced Dr. Seymour's observation that going back to work would be "the best thing" for Plaintiff.

Plaintiff appealed, through counsel, on April 20, 2006. He supplied additional medical records, as well as letters from Dr. Seymour and Dr. Holtzmeier. In a letter dated April 21, 2006, Dr. Holtzmeier wrote:

> [Plaintiff] remains unable to work as a result of his back injury and persistent back pain. He suffers from significant back pain which leads to significant fatigue and difficulty with concentration. . . . The back pain leads to difficulty concentrating which interferes with his ability to work. I expect that this disability will last longer than one year, and he should qualify for long-term disability. . . . He is unable to concentrate at work beyond periods of time of approximately half an hour. He has to take frequent rests due to back pain.

On June 1, 2006, Dr. Seymour wrote to the plan administrator to clarify his statement that going back to work would be the best thing for Plaintiff. Dr. Seymour explained:

> When the denial letter was sent out it stated that I thought the best thing for [Plaintiff] was to go back to work. I believe that is true with anyone. Being off work causes a lot of psychological trauma—finding a way to work with pain is ultimately the answer for him.

Dr. Seymour explained that "the issue of [Plaintiff's] ability to work [is] very complicated[,]" but what Plaintiff needed most was "a trial of work in an environment with reasonable hours and accommodations, while undergoing a pain management program." (Admin. R. 186)    Because Lucent rejected Plaintiff's proposal of accommodations, Dr. Seymour urged the plan administrator to "please reconsider the decision to deny disability."

In spite of the new evidence, the plan administrator denied Plaintiff's appeal in a letter dated June 7, 2006.  The letter reported that one of the plan administrator's in-house medical directors "reviewed the medical information [in Plaintiff's file] and advised the medical record review fails to reveal documented clinical findings to support limitations imposed." (Admin. R. 181)    With respect to Dr. Seymour and Dr. Holtzmeier's reports of Plaintiff's mental impairments, the plan administrator wrote:

> While these limitations were noted, we have not been provided with mental status examination findings, neuropsychological testing or treatment records supporting a cognitive impairment resulting in restrictions.

Plaintiff appealed for a second time on July 31, 2006.  He submitted additional evidence including:

- Psychiatric report by Dr. David Weaver from August 9, 2006.  Dr. Weaver diagnosed Plaintiff with "[p]ain disorder w/ psych features & general medical condition; Bipolar disorder; PTSD in partial remission; and OCD." (Admin R. 171)  With respect to work-related abilities, Dr. Weaver wrote:

> [Plaintiff's] ability to relate to family, friends, neighbors, and co-workers seems markedly impaired due to isolation, mood disorder, rumination and anxiety.  His ability to maintain attention, persistence, and pace seem moderately impaired by his obsessive hoarding, helplessness and naps.  His ability to understand, remember and follow instructions seems not impaired,

but no assessment was available. Thus, his ability to withstand the stress and pressure of day-to-day work seems markedly impaired. He responds to 'average' daily stress with hoarding, depression, anxiety, and untreated apnea may worsen his chronic pain.

- Psychiatric report by Dr. Beal Lowe on August 31, 2006. Dr. Lowe administered the Beck Depression Inventory, and wrote that Plaintiff's "score of 31 indicates Severe depression." (Admin. R. 166)  Dr. Lowe concurred with Dr. Weaver's diagnoses and opined that Plaintiff's condition rendered Plaintiff disabled from working. He found Plaintiff to be "so overwhelmed by work, family and money situations, and by his various psychological conditions, that he has no capacity to manage the pain which is the predominant feature of both his verbal and his behavioral clinical presentation." (Admin. R. 167)  Dr. Lowe found "no suggestion that [Plaintiff] is malingering or exaggerating his symptoms."

- Medical records from Licking Memorial Hospital and Shepherd Hill Behavioral Health Services, where Plaintiff was admitted on September 12, 2006. Plaintiff was hospitalized at Shepherd Hill for twelve days after an emergency psychiatric evaluation. The submitted record includes, among other documents:

  - Family and Medical Leave Certification form from psychiatrist Phillip Borders, dated September 27, 2006, concluding that Plaintiff "has severe Bipolar [disorder], depression and paranoid delusions" and "is so impaired that he requires significant assistance from wife." (Admin. R. 88, 90)

  - Axis I diagnosis from Dr. Borders, dated September 28, 2006: "Bipolar disorder, depressed, severe with psychosis." (Admin. R. 146)

After acknowledging that it had received and reviewed the psychiatric information from Dr. Weaver, Dr. Lowe, and Shepherd Hill, the plan administrator denied Plaintiff's second and final appeal on January 4, 2007.

Plaintiff filed for Chapter 13 personal bankruptcy on October 14, 2007. On January 7, 2009, Plaintiff filed a Complaint in the United States District Court for the Southern District of Ohio alleging that Defendant wrongfully denied him long term disability benefits in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B). Defendant answered, and both parties moved for judgment on the administrative record. On March 10, 2011, the district court issued an opinion and order denying both parties' motions and remanding Plaintiff's claim to the plan administrator for further review of the mental

component of Plaintiff's claim. In its opinion, the district court found that the proper standard of review of the plan administrator's decision was *de novo*.

After the district court remanded the case to the plan administrator in March 2011, Plaintiff submitted additional evidence to the plan administrator, including:

- Medical records from Dr. Gautam Samadder, dated October 2001 through October 2009. Dr. Samadder has treated Plaintiff since 2001 for obstructive sleep apnea, narcolepsy, and severe restless leg syndrome. On October 11, 2005, Plaintiff consulted with Dr. Samadder for sleep maintenance insomnia, daytime sleepiness, and sleepiness while driving.

- Medical records and discharge instructions from Ohio State University's Harding Hospital, dated October 4, 2006. Four days after Plaintiff was released from his twelve-day hospitalization at Shepherd Hill behavioral health facility, Plaintiff was hospitalized for another six days at Harding Hospital. Plaintiff was admitted to Harding on September 28, 2006 and discharged on October 4, 2006.

- Medical records from Dr. Rao Lingam, dated January 3, 2008 through February 2011. Dr. Lingam diagnosed Plaintiff as suffering from, *inter alia*, myofascial pain syndrome. Since 2008, Dr. Lingam has treated Plaintiff with trigger point injections and medication.

- Plaintiff's Social Security disability file, which contained, *inter alia*:

    - Plaintiff's application to the Social Security Administration ("SSA"), dated December 31, 2005, in which Plaintiff explained that his pain caused him to "mentally freeze," rendering him unable to concentrate. He wrote, "I [cannot] move on from what I am doing. I can't focus on anything but the pain. I have lost hours when this happens and don't know what I have done or where I have been." (Supp. Admin. R. 407)

    - Letter dated November 5, 2008 from Plaintiff's spouse to the Administrative Law Judge ("ALJ") deciding Plaintiff's social security claim. Plaintiff's spouse expressed concern about Plaintiff's erratic behavior and delusional thoughts.

    - A copy of an e-Bay listing that Plaintiff had posted on October 19, 2008 promising that, for a payment of $1,100,000, he would assure that the "Republic [sic] Party (GOP)" would "win or nearly win" the 2008 election. (Supp. Admin. R. 603–07)

    - Disability Report, completed by Plaintiff's spouse stating that Plaintiff is "unable to remember things [and] confused in thought processes. He can't complete tasks and is [delusional] about facts." (Supp. Admin. R. 438)

- Dr. Lowe's medical report from January 2007. Dr. Lowe indicated that Plaintiff is "withdrawn, isolated, [and] preoccupied w[ith] pain and mistreatment" and "[t]oo anxious, depressed [and] pain-focused to perform any job function." Dr. Lowe opined: "I believe [Plaintiff] is totally disabled by psychological conditions diagnosed by me including Pain Disorder (307.89), Bi Polar Disorder (296.89) OCD (3003.3) and PTSD (309.81)." (Supp. Admin. R. 887–88)

- Dr. Steven Meyer's file review for the SSA, dated August 17, 2006. Dr. Meyer concluded that Plaintiff had two diagnosable mental health conditions—depression and "Adjustment Disorder with mixed anxiety and somatic concerns" (Supp. Admin. R. 847)—that moderately limited some of Plaintiff's ability to function.

- MRI from Cleveland Clinic in 2007 revealing "small to moderate right sided disc protrusion/herniation with displacement of the traversing right S1 nerve root and minor disc bulging and shallow left foranimal / far lateral protrusion/herniation. Mild to moderate proximal left foranimal stenosis."

- CT Scan from May 7, 2008 revealing "[h]igh-grade annular tear in biforaminal position at L4-5 level with suggestion of leakage of contrast on the right possibly contrast on the left. There is also a broad- based disc displacement at this level resulting in abutment of bilateral exiting L4 nerves." (Supp. Admin. R. 320–21). The CT Scan also demonstrated "[m]oderate degeneration of the disc at L5-S1 level with a broad-based disc displacement contributing to light effacement of bilateral exiting L5 nerves and abutment of bilateral descending S1 nerves."

- EMG performed by Dr. James J. Powers on April 11, 2008, which demonstrated "[e]vidence of L5-S1 radiculopathy (mild, acute o[r] chronic bilaterally," and "[e]vidence of left lower cervical radiculopathy (mild, acute o[r] chronic)." (Supp. Admin. R. 322–24)

- SSA's determination that Plaintiff was totally disabled from working at any job. In a decision dated November 28, 2008, the ALJ concluded that Plaintiff was disabled solely due to physical impairments, which included "insulin dependent diabetes mellitus with end organ damage, mild anemia, prostate cancer without metastasis, sleep apnea, restless legs syndrome, and nonradicular degenerative disc disease at L4-5-S1." (Supp. Admin. R. 625) The ALJ added that while Plaintiff "may have one or more mental impairments," it was not necessary to address them. In addition, the ALJ found Plaintiff's testimony about limitations in his ability to walk, stand, and sit to be "generally credible."

In August 2011, the plan administrator hired two doctors——psychiatrist Marcus J. Goldman and neurologist Choon S. Rim—to conduct independent medical reviews ("IMRs") of the medical information in Plaintiff's claim file.[2]  Although the Plan reserved the right to require Plaintiff to appear for a medical examination by a designated physician, it did not avail itself of the opportunity.

Dr. Goldman reviewed the psychological evaluations of Dr. Borders and Dr. Lowe, but discredited their professional opinions after finding the diagnoses "unsupported by regular and reliable progress notes since 2006." *Appellee Br.* at 10.  Dr. Goldman "noted the lack of any ongoing treatment or re-evaluation for psychiatric functionality conducted by Dr. Lowe after the 2006 report." *Id.*  From his file review, Dr. Goldman concluded that, with the exception of the dates that Plaintiff was in an in-patient unit in 2006, the medical evidence did not "clearly, explicitly, consistently, or in any . . . compelling or objective fashion" support the presence of a mental disorder of such severity as to preclude Plaintiff from functioning or working.  *Id.* at 9–10.[3]

Dr. Rim reviewed Plaintiff's diagnostic test results, psychiatric evaluations, medical evaluations from Plaintiff's treating physicians, and the Independent Medical Examination ("IME") conducted by Dr. Gary Skaletsky.  Based upon his review, Dr. Rim determined that, from a neurological standpoint, the disability determinations made by Plaintiff's treating physicians, Dr. Seymour and Dr. Holtzmeier, were not supported by the record.  Dr. Rim concluded that Plaintiff could perform his sedentary job with modest restrictions, such as frequently changing positions and refraining from lifting over ten pounds.

On September 6, 2011, the plan administrator denied Plaintiff's claim for benefits once again.  On January 11, 2012, Plaintiff successfully moved to reactivate the case in

---

[2] Such an evaluation is commonly referred to as a file review.

[3] We note that it was improper for Dr. Goldman to draw adverse inferences from any lack of post-2006 evidence.  As previously explained, the relevant inquiry is whether Plaintiff was unable to work as a software engineer between November 25, 2005 and November 25, 2006.  Accordingly, evidence that Plaintiff continued receiving treatment for his mental illness beyond November 25, 2006 would not have been relevant to the claim Dr. Goldman was asked to evaluate.  At best, if submitted, such evidence would serve only to bolster the reliability of the earlier diagnoses.

federal court. In district court for the second time, both parties once again filed cross-motions for judgment on the administrative record. On June 20, 2012, the district court issued its opinion and order, which it filed under seal,[4] granting Defendant's motion for judgment on the administrative record and denying Plaintiff's motion for judgment on the administrative record. Plaintiff timely appealed.

## DISCUSSION

### I.    Judicial Estoppel

We consider first whether Plaintiff should be judicially estopped from pursuing his claim for long term disability benefits. Defendant contends that Plaintiff should be judicially estopped from pursuing the present claim because Plaintiff failed to bring the claim to the attention of the bankruptcy court in the Chapter 13 bankruptcy action Plaintiff filed on October 14, 2007. Defendant previously raised this argument twice before the district court: first in a motion for summary judgment, and second in its briefing for judgment on the administrative record. The district court rejected Defendant's argument both times, and declined to apply judicial estoppel "based on the specific facts present in this action."

We review *de novo* a district court's decision regarding the application of judicial estoppel. *See White v. Wyndham Vacation Ownership, Inc.,* 617 F.3d 472, 476 (6th Cir. 2010); *Eubanks v. CBSK Financial Group, Inc.,* 385 F.3d 894, 897 (6th Cir. 2004). In several recent cases, this Court has "questioned the continuing viability of the *de novo* standard for judicial estoppel, noting the Supreme Court's characterization of the doctrine as an equitable remedy 'invoked by the court at its discretion' and recognizing that the 'majority of federal courts' review for abuse of discretion." *Kimberlin v. Dollar*

---

[4] Although certain documents in the court below, including the district court's opinion, were filed under seal, there is no order sealing documents in this case on appeal. The parties' briefs, which are available on the public docket, discuss the information contained in those sealed documents at length. Sixth Circuit Rule 25(h)(5) provides that "[d]ocuments sealed in the lower court or agency must continue to be filed under seal in this court." Therefore, the documents sealed below have not been filed on the public docket in this case. However, we believe that the discussion of the information contained in those sealed documents by the litigants in their briefs obviates the purposes for the sealing. Because the information is available to the public in the parties' briefs, we do not believe that this Opinion should be sealed, or that redaction is necessary.

*General Corp.*, 520 F. App'x 313 n.1 (6th Cir. 2013) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)); *see also Lewis v. Weyerhaeuser Co.,* 141 F. App'x 420, 424 (6th Cir. 2005) ("In light of *New Hampshire* and the extensive contrary authority, we question the continued use of the *de novo* standard in the context of judicial estoppel."); *but see Lorillard Tobacco Co. v. Chester, Willcox, & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) ("The Supreme Court did not instruct that an abuse of discretion standard is appropriate, and this Court has continued to adhere to the *de novo* standard after *New Hampshire*. Without a more definitive statement from the Supreme Court, this Court is bound by its own precedent and will therefore apply the *de novo* standard to the district court's order.")

Although this issue remains unresolved in this Circuit, we need not resolve it in the present case because the district court's ruling was proper under either standard. *See Kimberlin*, 520 F. App'x at 313 n.1 (declining to adopt an abuse of discretion standard for review of judicial estoppel rulings because the district court would be affirmed under the *de novo* standard); *Weyerhaeuser,* 141 F. App'x at 424 (same); *Leonard v. Southwestern Bell Corp. Disability Income Plan,* 341 F.3d 696, 700 (8th Cir. 2003) (same).

The doctrine of judicial estoppel seeks "to preserve the integrity of the courts," *Browning,* 283 F.3d at 776 (citation omitted), by "generally prevent[ing] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire,* 532 U.S. at 749 (citation omitted). Though there are no "inflexible prerequisites" for judicial estoppel, *id.* at 751, this Court has

> applied the doctrine to bar employment related claims not disclosed in prior bankruptcy proceedings where (1) the debtor assumed a position contrary to one she asserted under oath while in bankruptcy; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the debtor's omission did not result from mistake or inadvertence.

*Kimberlin*, 520 F. App'x at 314.  We have made clear that "judicial estoppel does *not* apply where the prior inconsistent position occurred because of 'mistake or inadvertence.'" *Weyerhaeuser*, 141 F. App'x at 425 (emphasis added) (quoting *Browning*, 283 F.3d at 776) (internal quotation mark omitted).  Failure to disclose a claim in a bankruptcy proceeding also may be excused where the debtor lacks a motive to conceal the claim, *Browning*, 283 F.3d at 776, or where the debtor does not act in bad faith, *Eubanks,* 385 F.3d at 895.

Plaintiff argues that any omission was wholly inadvertent, that he did not act in bad faith, and that he lacked any motive to conceal the claim.  To support his position, Plaintiff submitted affidavits and other evidence indicating that he was not responsible for, and was entirely unaware of, any omission.  Specifically, the evidence shows that Plaintiff and his spouse disclosed the claim to their bankruptcy attorney in writing and discussed the claim with their bankruptcy attorney, which suggests that any error was the fault of the attorney and not Plaintiff.

The district court considered the evidence and declined to apply the doctrine to bar Plaintiff's case, explaining that the uncontested evidence supported Plaintiff's position:

> The Court has reviewed the affidavits of Plaintiff and his wife, as well as proffered documentation, which indicate that any non-disclosure was at best inadvertent and will be remedied.  Uncontested evidence indicates that Plaintiff's wife prepared information for their bankruptcy attorney that included the benefits claim at issue in this case.  Additional uncontested evidence indicates that Plaintiff and his spouse were not aware of any mislabeling of the claim or its omission. . . .
>
> Defendant has failed to produce any evidence that the foregoing factual assertions are incorrect.  In light of such uncontested evidence–and even assuming *arguendo* that there has been a conflicting prior representation upon which the bankruptcy court relied–this Court can only conclude that there is no basis for applying the equitable doctrine of judicial estoppel under these circumstances.  There is simply no basis to infer intentional concealment. . . .
>
> The Sixth Circuit has urged courts to apply judicial estoppel with caution to avoid impinging on the truth-seeking function of the court.

Application of the doctrine here would preclude getting to the merits based on what the only evidence before this Court characterizes as at best inadvertent error.

A fresh review of the facts and evidence in this case leads us to the same conclusion: any omission was almost certainly due to carelessness or inadvertent error as opposed to intentional, strategic concealment or impermissible gamesmanship. We note also that under Ohio laws, proceeds from a disability insurance policy are completely exempt from a debtor's estate (i.e., set aside for the benefit of the debtor) to the extent that they are necessary for the support of the debtor and his family. OHIO REV. CODE § 3923.19(A). Accordingly, Plaintiff had no motive for intentionally concealing the claim.

Since Defendant's argument fails even under *de novo* review, it also fails under the more demanding "abuse of discretion" standard. For these reasons, the district court did not err in holding that Plaintiff was not judicially estopped from pursuing his long term disability claim.

## II.    Remand on *De Novo* Review

We consider next whether the district court erred when it remanded Plaintiff's disability claim to the plan administrator "for a full and fair review of [Plaintiff]'s disability claim." (R. 39, Opinion at 12–13). We review the district court's choice of remedy in an ERISA action for abuse of discretion. *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 372 (6th Cir. 2009); *see also Willcox v. Liberty Life Assurance Co. of Boston*, 552 F.3d 693, 703 (8th Cir. 2009) (finding that the district court did not abuse its discretion in remanding the case to the plan administrator for further administrative review).

Plaintiff sets forth a compelling argument that the district court, "while correctly determining that *de novo* [review] was required, nonetheless applied the standards applicable to deferential review." *Appellant Br.* at 24. Plaintiff contends that the district court's "decision to remand the case to [the plan administrator] . . . reflected the district court's misunderstanding of the difference between deferential and *de novo* review." *Id.*

Defendant, on the other hand, contends that the district court's decision to remand the case was proper because the record lacked factual findings that would be relevant to its decision.

Admittedly, some of the analysis and case law in the district court opinion suggest that the district court gave too much deference to the plan administrator. *See Salve Regina Coll. v. Russell,* 499 U.S. 225 (1991) ("When *de novo* review is compelled, no form of appellate deference is acceptable."); *see also Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002) ("When applying a *de novo* standard in the ERISA context . . . . [t]he [plan] administrator's decision is accorded no deference or presumption of correctness."). For example, the opinion states: "The administrative record fails to indicate . . . that [the plan administrator] reached a decision denying [the psychological] component of [Plaintiff]'s claim *as the result of a deliberative, principled reasoning process*. . . . This is problematic for [Defendant] because this Court 'cannot uphold an ERISA plan administrator's determination if it is not the product of 'a deliberate, principled reasoning process." (R. 39, Opinion at 11–12) (quoting *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613 (6th Cir. 2006)) (quoting *Glenn v. Metro Life Ins. Co.,* 461 F.3d 660, 666 (6th Cir. 2006)) (internal quotation marks omitted) (emphasis added). The district court's analysis is problematic because it is irrelevant on *de novo* review whether a plan administrator's decision was principled or reasoned; the plan administrator's reasoning (or lack thereof) is only important when a court engages in deferential review. Additionally, all of the cases upon which the district court relied—*Elliott*, 473 F.3d 613; *Glenn,* 461 F.3d 660; *Smith v. Continental Cas. Co.*, 450 F.3d 253 (6th Cir. 2006); and *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20 (1st Cir. 2005)—were cases decided on deferential review.

However, the district court's standard of review and authority to remand are legally and analytically distinct, and, even under *de novo* review, remand is the appropriate remedial measure where further fact-finding is necessary to determine claimant eligibility for benefits. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) (recognizing that remand is proper where there are factual determinations that

need to be made to determine whether a participant is entitled to benefits).  Thus, the relevant inquiry is whether the district court remanded this case for the permissible purpose of further fact-finding to supplement what it felt was an incomplete record, or, alternatively, remanded this case for the impermissible purpose of affording the plan administrator a chance to correct its reasoning for rejecting Plaintiff's application.

A close examination of the administrative record and district court opinion reveals that the district court intended to remand the case for further fact-finding to supplement the incomplete record.  In its opinion, the district court appears to adopt Defendant's argument "that the record is not sufficiently developed to make an informed decision on the existence of any claimed psychological disability, and [Defendant] does not know whether the Court has familiarity with the Plan or the medical expertise necessary to make a disability determination in the first instance." (R. 39, Opinion at 12) (quoting R. 37, Def's Resp. Opp. Mot. for Judg. on Admin. Rec., at 10–11) (internal quotation marks omitted).  Additionally, the court twice mentions a lack of "findings" in the administrative record.  Although we are troubled by the fact that the district court articulated the remedy as "remand for a full and fair review," which is typically associated with deferential review, the court's concern over the inadequate factual findings and insufficient development of the administrative record suggests that the district court intended to remand the claim for further development of the record, and not merely out of deference to the plan administrator.

Therefore, we decline to hold that the district court abused its discretion in remanding the claim to the plan administrator.

**III.     Plaintiff's Entitlement to Long Term Disability Benefits**

Finally, we consider whether the district court erred in denying Plaintiff's claim for disability benefits.  We review the district court's judgment on Plaintiff's ERISA claim *de novo*, applying the same standard of review to the plan administrator's action as required by the district court.  *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 427 (6th Cir. 2006).  As the district court correctly determined, and as Defendant conceded at oral argument, the plan administrator's decisions in this case are not entitled to deference.

*See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998) ("In cases in which a plan administrator is given no discretionary authority by the plan, review of the plan administrator's decision by the district court—as well as the court of appeals—is *de novo,* with respect to both the plan administrator's interpretation of the plan and the plan administrator's factual findings."). Therefore, we take a "fresh look" at the administrative record, *id.*, giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings, and "accord[ing] no deference or presumption of correctness" to the decisions of either the district court or plan administrator, *Hoover*, 290 F.3d at 809.

To succeed in his claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that he was "disabled," as that term is defined in the Plan. *See Tracy v. Pharmacia & Upjohn Absence Payment Plan,* 195 F. App'x 511, 516 n.4 (6th Cir. 2006) (plaintiff bears the burden of proof in an ERISA benefits case); *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008). The Plan defines the term "disabled" for the relevant period—November 25, 2005 to November 24, 2006—as follows: Plaintiff is "prevented by reason of . . . disability . . . from engaging in [his] occupation or employment at the Company." (Admin. R. 005) Thus, the dispositive inquiry is whether Plaintiff was—on November 25, 2005—unable to work for Lucent as a software engineer due to his physical condition, his mental condition, or a combination of the two.[5] After a careful and comprehensive review of the full administrative record and supplemental administrative record, we find that Plaintiff has established that he was unable to work as a software engineer at the relevant time.

In reaching this conclusion, we first looked to the nature of Plaintiff's job. *See Elliott*, 473 F.3d at 618 (a decision on a disability benefits claim requires "an application of the relevant evidence to the occupational standard" because "medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability"). Both

---

[5]*See* footnote 1, *supra* at 4.

parties agree that Plaintiff's job as a software engineer was technically and intellectually demanding and required sitting for prolonged periods of time.

We next looked at the medical evidence, and applied it to the occupational standard. The medical evidence in the administrative record indicates that a combination of extreme pain, and mental illness, and the effects of pain medication made it exceedingly difficult for Plaintiff to concentrate, handle stress, stay awake during the day, remember things, relate to co-workers, make decisions, or sit for any extended period of time. Anecdotal evidence of Plaintiff's erratic behavior bolsters the medical evidence that Plaintiff was not competent to perform his job. Three different physicians—Dr. Holtzmeier, Dr. Seymour, and Dr. Saguil—each of whom treated Plaintiff during the relevant time frame, found him unable to return to work. Of the two psychiatrists who evaluated Plaintiff in 2006, one determined that he was seriously mentally ill and incapable of working, and the other found substantial impairment in Plaintiff's ability to sustain the stress and pressure of day-to-day work. Their diagnoses were confirmed shortly thereafter by Dr. Borders, a psychiatrist at Shepherd Hill behavioral health facility, when Plaintiff was hospitalized for twelve days for mental illness in an acute in-patient unit in September 2006. This evidence supports Plaintiff's testimony that he could not "perform[] timely and quality work" or deliver "any commercial grade work." (Admin. R. 519–20)

Juxtaposed against this array of evidence is the opinion of Dr. Skaletsky from July 2005, as well as the opinions of Dr. Goldman and Dr. Rim, neither of whom ever examined Plaintiff and whose opinions are based on file reviews undertaken in August 2011.

While Dr. Skaletsky's report is relevant and informative, his suggestion that "there is no anatomic or physiologic basis for the chronic pain syndrome that is present" does not preclude a finding that Plaintiff was disabled. (Admin. R. 278) On the contrary, Dr. Skaletsky's finding that there is no neurological basis for Plaintiff's pain, accompanied by his "concern[] that there is a strong psychogenic input to the symptoms," (Admin. R. 277) actually bolsters the mental component of Plaintiff's claim.

Similarly, we are not pursuaded by the opinions of Dr. Goldman and Dr. Rim, which were based solely on a review of Plaintiff's file. Although there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 296 (6th Cir. 2005), the opinions of Dr. Goldman and Dr. Rim do not provide a very solid basis for finding that Plaintiff was not entitled to disability benefits. First, file reviews are questionable as a basis for identifying whether an individual is disabled by mental illness. *See Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 505–09 (6th Cir. 2008) (noting that "[c]ourts discount the opinions of psychiatrists who have never seen the patient for obvious reasons"). Second, reliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints. *See Evans v. UnumProvident Corp.,* 434 F.3d 866, 878 (6th Cir. 2006) ("Where . . . conclusions from [a file] review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.").

In addition, we note that there were several problems with Dr. Goldman's analysis and report. As previously discussed, Dr. Goldman erroneously drew negative inferences from the lack of evidence regarding Plaintiff's mental health after 2006. *See* footnote 3, *supra* at 12. In particular, we are troubled by the fact that Dr. Goldman overlooked certain evidence in the file and drew adverse conclusions about the "absence" of such evidence. For instance, Dr. Goldman found it significant that none of Plaintiff's "non-mental health providers" reported any findings that would support significant psychopathy (Supp. Admin. R. 179), overlooking the Attending Physician Statements completed by Dr. Holtzmeier and Dr. Seymour, both of whom are "non-mental health providers," documenting their observations that Plaintiff was not mentally fit to work. Dr. Goldman also claimed that "at no time has there been any formal psychological testing, including MMPI, PAI, or MCI to better establish the nature and extent and veracity of the claimant's complaints," ignoring Dr. Lowe's administration of the Beck Depression Inventory, which indicated "Severe depression." (Supp. Admin. R. 180) We also found it troublesome that Dr. Goldman ignored the intellectual aspects

of Plaintiff's job as a software engineer.  *See Elliott*, 473 F.3d at 618; *see also Rohr v. Designed Telecommunications, Inc.*, 2009 WL 891739 at *11 (S. D. Ohio, 2009) ("Jefferson Pilot ignored the most significant aspects of Plaintiff's job, *i.e.*, the intellectual and/or mental functions.").  Although Dr. Rim's report was less factually and analytically problematic than Dr. Goldman's report, Dr. Rim's file report was very limited in scope, and only answered the question of whether Plaintiff is disabled "strictly from a neurological standpoint."  (Supp. Admin. R. 193)

Plaintiff submitted medical evidence from numerous doctors and therapists who directly treated or examined him and concluded that he was unable to work due to a combination of his physical and mental conditions.  He visited over a dozen medical experts.  Those doctors who knew him best concluded, unequivocally, that he was unable to work at the relevant time.  Defendant offers little to contradict this evidence.  Accordingly, Plaintiff is entitled to disability benefits for the relevant period.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court granting Defendant's motion for judgment on the administrative record and denying Plaintiff's motion for judgment on the administrative record, and **REMAND** to the district court with instructions that the district court enter judgment in favor of Plaintiff on the administrative record.