NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0352n.06

No. 17-2453

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>LAUREN L. HUTSON,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>FILED<br>Jul 16, 2018<br>DEBORAH S. HUNT, Clerk</td></tr>
<tr><td>Plaintiff-Appellant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td></td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td>RELIANCE STANDARD LIFE INSURANCE</td><td>)</td><td>COURT FOR THE WESTERN</td></tr>
<tr><td>COMPANY,</td><td>)</td><td>DISTRICT OF MICHIGAN</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant-Appellee.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

Before: COLE, Chief Judge; SUTTON and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. After a tragic car crash, Lauren Hutson sought to recover accidental death benefits under a policy issued to her brother by Reliance Standard Life Insurance Company. Reliance denied benefits under a policy exclusion that precluded recovery for "any loss . . . to which sickness, disease, or myocardial infarction . . . is a contributing factor."[1] Hutson filed suit under ERISA to challenge that decision. The district court granted Reliance's motion for judgment on the administrative record. We AFFIRM.

I.

Robert Krugman was an employee of Gast Manufacturing. As an employee benefit, Krugman elected coverage under a Reliance accidental death and dismemberment (AD&D) policy,

_____

[1] A myocardial infarction is more commonly known as a heart attack. *See Heart Attack (Myocardial Infarction): Symptoms*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/16818-heart-attack-myocardial-infarction/symptoms.

which was an employer-sponsored plan governed by ERISA, 29 U.S.C. §§ 1001 *et seq.* Krugman named his mother, Helen Krugman, as the primary beneficiary on the policy and his sister, Lauren Hutson, the plaintiff in this case, as the secondary beneficiary.

On August 28, 2014, Krugman was driving his orange Honda Fit eastbound on Red Arrow Highway in Hartford Township, Michigan, with his mother in the passenger's seat. The weather at the time was partly cloudy, and the roadway was dry. Peter Sinclair was driving his maroon Ford Escape westbound on the same road. At 10:28 a.m., the two cars collided head-on in the westbound lane. Both cars travelled east from the collision point and came to rest facing west on the westbound side of the highway—Sinclair's Escape was completely north of the fog line.

Krugman's mother was pronounced dead at the scene. Krugman was "unconscious, but breathing" when police arrived; emergency personnel extracted him from the car and rushed him to the hospital, but doctors pronounced him dead shortly after he arrived. His death certificate listed his cause of death as "[m]ultiple blunt force injuries" from a "[m]otor vehicle accident." Sinclair survived. He was taken to the hospital, treated for minor wounds, and released.

Michigan State Police Trooper Nathan McClain was among the first responders. At McClain's request, his colleague, Trooper Jim Janes, came to the scene to reconstruct the accident. In an effort to determine what caused the collision, both officers individually interviewed Takela Broyles, who lived on the south side of Red Arrow Highway. Broyles told McClain that she saw the Escape cross the center line into the eastbound lane, noting to Janes that it "appeared to lose control." She also said that the driver of the Fit honked the horn prior to the crash in what appeared to be an attempt to get the attention of the driver of the Escape, but she later admitted that she did not see the Fit or the actual collision. When Janes asked Broyles if the Escape "could have been going off the road to avoid a collision with the [Fit]," she "stated that that could be right." Broyles

told McClain that she had seen the crash from her kitchen window, which was between seventy and eighty feet from the crash site. When Janes had Broyles take him to her kitchen window, he noted that "a large tree obstructed her view of the crash site" from that vantage point. The only other witness interviewed was Cynthia Roethel, who lived on the north side of Red Arrow Highway. She told McClain that she heard a horn sound and then heard the crash, but she could not provide any other details.

Both officers also interviewed Sinclair—one at the crash site and the other almost a month after the accident. Sinclair told both officers that Krugman had driven the Fit over the center line into the westbound lane. Sinclair said that he had swerved toward the right shoulder to avoid the crash. When asked, Sinclair told McClain he had not sounded his horn; but Sinclair later told Janes that he could not remember whether he had honked. Sinclair also told Janes that he thought he had applied the brakes prior to the crash.

Based on the witness statements and their views of the physical evidence at the crash, both officers separately concluded that Krugman had crossed the center line in his Fit and struck Sinclair's Escape. McClain's narrative did not provide a reason for the accident, and Janes explicitly stated that he did not know why Krugman had driven into the westbound lane.

Michigan State Police Sergeant James Campbell created an incident report on September 4, 2014, based on the evidence gathered by the other officers on the day of the crash and based on crash data retrieved from Sinclair's Escape.[2] The data showed that Sinclair had been driving his Escape in a roughly straight line during the five seconds before the crash until, just one second before impact, he turned the steering wheel sharply to the right (away from the center line). Sinclair also applied the brakes sometime between one second and one half second before the

---

[2] The Fit was not equipped with a system that provides similar data.

crash. Based on that data, Campbell concluded that the Fit had crossed the center line into the westbound lane for an unknown reason and that the Escape "took evasive action by steering right [at a sharp angle] and braking from 46 mph to 32.3 mph in less than 1 second."

Dr. Stephen Cohle, a forensic pathologist, performed Krugman's autopsy. Dr. Cohle's inventory of Krugman's belongings noted that there was "a pattern of what appears to be a pedal on the sole of the boot." Among his final diagnoses, he included: "[t]raumatic rupture of abdominal aortic aneurysm"; "[a]rteriosclerotic cardiovascular disease," which involved "90% narrowing of right coronary artery," "[a]bdominal aortic aneurysm," and "[a]cute and subacute infarct of the lateral wall of the left ventricle"; and "[h]ypertensive cardiovascular disease," which included "[l]eft ventricular hypertrophy" and "[a]rteriolonephrosclerosis." Dr. Cohle listed the rupture of the abdominal aortic aneurysm as the cause of death and accident as the manner of death. Based on the autopsy, Trooper McClain included in his report that there were "no signs that [Krugman] suffered from a heart attack." The report did not explain or acknowledge Dr. Cohle's statement in the autopsy that Krugman suffered from "[a]cute and subacute infarct of the lateral wall of the left ventricle."

Shortly after Krugman's death, Hutson filed a claim for AD&D benefits as her brother's beneficiary. Reliance denied the claim based on the policy exclusion. Citing Dr. Cohle's autopsy, Reliance concluded: "Mr. Krugman had an abdominal aortic aneurysm (with Arteriosclerotic cardiovascular disease and Hypertensive cardiovascular disease with left ventricular hypertrophy and Arteriolonephrosc[l]erosis), which are sickness and disease conditions, and these conditions contributed to Mr. Krugman's loss."

Hutson requested a review of the adverse determination and submitted further documentation to support her claim for benefits, including a peer review report from Dr. Bader

Cassin. After reviewing the medical records and autopsy, Dr. Cassin said that he was "confident that Robert Krugman's death resulted 'directly and independently from injury, with no other contributing cause.'" He said that the "small aneurysm" that "was present . . . in Robert's aorta is coincidental and would have presented no independent increased danger of sustaining this injury," given the nature of the impact and the fact that Helen Krugman suffered a "parallel" injury despite never having an aneurysm.

As part of its review, Reliance asked Dr. Evan Matshes to independently assess Hutson's claim. Dr. Matshes concluded that blunt trauma from the accident caused Krugman's death. Like Dr. Cassin, Dr. Matshes concluded that it was "highly unlikely that the aneurysm played any role whatsoever in increasing Mr. Krugman's risk of dying." Dr. Matshes noted, however, that Krugman suffered an "acute and evolving left ventricle myocardial infarction" along with his other cardiovascular issues. He concluded that "there is compelling evidence to suggest that Mr. Krugman was incapacitated or dying from an acute/subacute myocardial infarction, and that this myocardial infarction was the reason that he drifted out of his lane, colliding with the oncoming car."

Relying on Dr. Matshes's opinion, Reliance again denied Hutson benefits. Reliance concluded that "a myocardial infarction contributed to the motor vehicle accident ultimately resulting in Mr. Krugman's unfortunate death."

Hutson filed a federal suit under ERISA seeking benefits under the policy. Both parties moved for judgment on the administrative record. The district court found that the evidence showed that Krugman drove his Honda Fit over the center line into the westbound lane and found that "Dr. Matshes provided a reasoned, sound, and logical medical explanation" for the crash. Because that meant a myocardial infarction was a contributing factor in Krugman's death, the

district court granted Reliance's motion and affirmed the denial of benefits. Hutson appealed the district court's decision and now argues that the record evidence shows that she is entitled to benefits.

II.

Our first question is: by what standard should we review the district court's decision in this case? We have said that district courts should treat motions for judgment on the administrative record in ERISA cases neither like motions for summary judgment under Federal Rule of Civil Procedure 56 nor like standard bench trials. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618–19 (6th Cir. 1998) (Gilman, J., concurring) (delivering the opinion of the court on this issue). Instead, our caselaw suggests that these motions fall somewhere in between. *Id.* We have said that "the district court should conduct a *de novo* review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly." *Id.* at 619. The parties do not dispute that the district court followed that procedure in this case.

We review de novo any legal conclusions of the administrator or the district court. *See id.* at 613 (majority opinion); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006). Less clear is whether we defer to the district court's factual findings or decide them de novo too. Hutson argues that we should decide the facts de novo based on our review of the record, while Reliance argues that we should accept the district court's factual findings unless they are clearly erroneous. Our cases point both ways.

In *Wilkins*, we said: "With respect to review of the plan administrator's denial of benefits, both the district court and this court review *de novo* the plan administrator's denial of ERISA benefits. . . . This *de novo* standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator." 150 F.3d at 613. This suggests, then, that our

review is of the administrative record directly and that we should practically disregard the district court's decision. *See Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th Cir. 2014) ("[W]e take a fresh look at the administrative record, . . . accord[ing] no deference or presumption of correctness to the decisions of either the district court or plan administrator." (second alteration in original) (internal quotation marks and citations omitted)). But later, in *Moore*, we acknowledged that we review *the administrator's* denial of benefits de novo, but nonetheless gave greater regard to the *district court's* factual determinations, finding that we review "the district court's decisions on matters of law in an ERISA benefits action *de novo* and its factual findings for clear error." 458 F.3d at 437–38; *see Mokbel-Aljahmi v. United Omaha Life Ins. Co.*, 706 F. App'x 854, 862–63 (6th Cir. 2017).

While both the district court's review and our review is limited to the administrative record, *see Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 607 (6th Cir. 2016), we note, along with the First Circuit, that "where the district court reviews the record of proceedings before the plan administrator de novo" and reaches a decision, "the argument for a more deferential standard of [factual] review has at least a patina of plausibility." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 111–12 (1st Cir. 2017). But we need not resolve the conflict in our caselaw today because, after examining the administrative record, we would reach the same result in this case whether we reviewed the district court's factual findings de novo or for clear error. We, therefore, proceed on the presumption that we review both the law and the facts de novo.

### III.

Hutson's main argument on appeal is that the evidence contradicts Dr. Matshes's conclusion that Krugman likely suffered from a heart attack, which caused him to lose control of

his car and cross the center line. She argues that the evidence shows it was Sinclair, not Krugman, who drove into oncoming traffic and that Krugman sounded his horn and drove into the westbound lane to try to avoid an accident. Hutson relies on Broyles's witness statement that she saw Sinclair's Escape cross the center line and that Krugman was honking his horn to avoid the accident. Hutson also notes that Krugman's boot had a pedal impression on it, so she suggests that he sped up and tried to swerve out of Sinclair's way, which she surmises is why both cars ended up on the westbound side of the highway. While it is not clear who honked his horn, Sinclair or Krugman, all the other evidence in the administrative record suggests that it was Krugman who drove his car into the westbound lane and that Sinclair unsuccessfully tried to avoid a collision by veering toward the shoulder of the road and applying the brakes.

Sinclair himself stated that is what happened. All three Michigan State Police Officers reached that conclusion. Trooper McClain and Trooper Janes did so after surveying the scene and talking to the witnesses. Sergeant Campbell did so with the additional benefit of the crash data from Sinclair's car, which suggested that Sinclair was driving relatively straight from five seconds before the crash until a second before the crash, when he swerved to the right and began applying the brakes. Although Broyles told McClain that she saw Sinclair's Escape cross the center line, McClain still concluded that Krugman was the one to cross into oncoming traffic. Furthermore, there are reasons to doubt Broyles's version of the story: Officer Janes noted that a tree obstructed her view of the crash site; Broyles told Janes that she did not see Krugman's car or the crash itself; and she admitted to Janes that it was possible that Sinclair could have swerved off the road to attempt to avoid the crash.

Hutson also claims the evidence shows that Krugman was not incapacitated when the accident occurred, pointing to the pedal impression on Krugman's boot to suggest that Krugman

was accelerating to avoid Sinclair. We agree that the boot impression likely indicates that Krugman's foot was on one of the pedals when the collision occurred. Without more, though, that information does not tell us much. It could be consistent with several possible explanations for the accident, including Dr. Matshes's conclusion that Krugman suffered a heart attack and was thereby incapacitated when he drove into the westbound lane.

Hutson also notes that no other doctor in this case said anything about Krugman being incapacitated prior to the crash. But it appears that the only other doctor who had reason to consider the question was Dr. Cassin. Although Dr. Cassin provides a reason to question whether Krugman's aneurysm contributed to his death, Dr. Cassin does not explain why Krugman's heart issues are not evidence in support of Dr. Cohle's conclusion that Krugman suffered a heart attack— that is, an "infarct of the lateral wall of the left ventricle." Dr. Cassin merely concluded that that a heart attack did not contribute to Krugman's death.

Finally, Hutson offers McClain's statement in his incident report that there "were no signs that [Krugman] suffered from a heart attack" to counter Dr. Matshes's opinion. But McClain's report, which was derived from Dr. Cohle's statement, is clearly contrary to Dr. Cohle's autopsy findings, which noted that Krugman suffered from "[a]cute and subacute infarct of the lateral wall of the left ventricle."

Dr. Matshes offers the most complete and convincing account of the crash, which is directly contradicted only by Broyles's unreliable account that it was Sinclair rather than Krugman who first drove into the wrong lane. Taken as a whole, the record shows that Krugman more likely than not crossed the center line in his Fit as a result of a heart attack, striking Sinclair's Escape as Sinclair turned toward the shoulder trying to avoid the accident.

Hutson next argues that, even if Krugman suffered a heart attack, such an event would be too attenuated to be a "contributing factor" to Krugman's death within the meaning of the policy exclusion. But she did not take that position in the district court. That court noted: "Hutson does not dispute that the exclusion would apply if Krugman's vehicle traveled into Sinclair's lane because Krugman was suffering a myocardial infarction; the myocardial infarction would have been 'a contributing factor.'" In the district court, Hutson argued only that there was insufficient evidence of a heart attack. By failing to present her legal argument in the district court, Hutson forfeited "[her] right to have the argument addressed on appeal." *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006); *see Hunt v. Metro. Life Ins. Co.*, 587 F. App'x 860, 862–63 (6th Cir. 2014) (applying the rule in our review of a district court's decision affirming a plan administrator's denial of benefits under ERISA).

\* \* \*

We, therefore, AFFIRM the district court's judgment granting Reliance's motion for judgment on the administrative record.