NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0768n.06

No. 14-3598

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 24, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ALAN SAFDI, MD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| COVERED EMPLOYER'S LONG TERM | ) | DISTRICT OF OHIO |
| DISABILITY PLAN UNDER THE UNION | ) | |
| CENTRAL EMPLOYEE SECURITY BENEFIT | ) | |
| TRUST; THE UNION CENTRAL LIFE | ) | OPINION |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: GUY, BATCHELDER, GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Alan Safdi ("Safdi") received long-term disability benefits for seven years before they were terminated. After several administrative appeals, Safdi sued for benefits owed under the private right of action created by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), and the Union Central Life Insurance Company ("Union Central") counterclaimed to recover alleged overpayments pursuant to § 1132(a)(3)(B). The district court granted Safdi's motion for summary judgment on Union Central's counterclaim. On cross-motions for judgment, the district court ultimately entered judgment for Union Central on Safdi's claim. Both parties appealed. After oral argument, we suggested that the parties attempt mediation, which resolved the cross-appeal from

the dismissal of Union Central's counterclaim. For the reasons stated herein, we affirm the judgment of the district court to dismiss Safdi's case.

## I.

## A.

Since 1983, Safdi has practiced with Greater Cincinnati Gastroenterology Associates Physicians, Inc. ("GCGA"), where he also served as an officer. In 1998, GCGA purchased group disability insurance for its doctors through Union Central. The primary document for the plan, the Union Central Master Policy ("the Policy"), described benefits for employees "in Active Full-Time Employment" with a covered employer. DE 32-1, Policy, Page ID # 4225. The Policy defined "Active Full-Time Employment" as follows:

> You must be:
>
> 1. working for the Covered Employer on a full-time basis and paid regular earnings;
> 2. performing Your normal duties, if it is a scheduled work day;
> 3. working at least the number of hours shown in the Coverage Schedule; and
> 4. working at Your normal place of employment or at some other location where the Covered Employer's business requires You to travel.

*Id.* The earliest Coverage Schedule in the record set the third condition at thirty (30) hours per week.

The Policy contained six options under which an employee of a participating employer would receive benefits. All options paid out only after an employee qualified for benefits after an "Elimination Period," which for GCGA's policy lasted ninety (90) days. The first four options required that the employee be "Totally Disabled" for varying lengths of time. Each option defined "Totally Disabled" as "unable to perform the material and substantial duties of Your Own Occupation due to an Injury or Sickness" for a certain number of months. *Id.* at 4229. The fifth option paid benefits for "Partial Disability" and is not relevant to this case.

The last scenario, Option VI, paid benefits for "Residual Disability," which the Policy defined as follows:

> Residual Disability means as a result of Injury or Sickness which caused Disability, You are unable to perform the material and substantial duties of Your Own Occupation on a full-time basis, and You are:
>
> 1. performing at least one of the material duties of Your Own Occupation or another occupation on a full-time or part-time basis; or
> 2. performing each of the material duties of Your Own Occupation or another occupation on a part-time basis. . . .

*Id.* at 4230.

The Policy clarified the Residual Disability option through a series of questions and corresponding answers. For example, in response to the question, "Can You Work During the Elimination Period?", the Policy noted that an employee could work during the Elimination Period and still receive Residual Disability benefits. *Id.* The Policy responded to the question, "What Are the Requirements to Qualify for a Residual Disability Benefit?", as follows:

> If You are Residually Disabled and have Current Monthly Earnings in excess of 20% of Your Average Monthly Earnings, You will be paid a Residual Disability Benefit if . . .
>
> 1. You satisfy the Elimination Period . . . ;
> 2. You submit satisfactory Proof of Disability to Us that You are Residually Disabled as defined in this Plan; and,
> 3. You are earning less than 80% of Your Average Monthly Earnings.

*Id.* at 4231.

Nowhere does the Policy explicitly define "Recurrent Disability." However, the Policy lends meaning to Recurrent Disability in another question-and-response set, as stated in full:

> What Happens If Your Disability Reoccurs After You Return to Work Full Time? A Recurrent Disability will be treated as part of a prior Disability if You suffer a subsequent Disability which is:
>
> 1. due to the same cause or a cause related to the prior Disability; and
> 2. less than 6 months has elapsed.

> If more than 6 months has elapsed from the time You ceased to receive Disability Benefits under this Plan and You suffer a subsequent Disability which is due to the same or a cause related to a prior Disability, a Recurrent Disability will be treated as a new period of Disability, and You will be required to complete a new Elimination Period.
>
> The Recurrent Disability provision will cease to apply on the earlier of the following dates:
>
> 1. the date You become eligible for benefits under any other Group Long Term Disability Policy; or
> 2. the date You are no longer covered under the terms of this Plan.

*Id.* at 4236.

> The Policy next explains the termination of Monthly Benefits:
>
> When Does the Monthly Benefit Terminate?  Your Monthly Benefit will continue to be paid until the earliest of the following dates occurs:
>
> 1. the date You are no longer Disabled;
> . . .
> 5. the date Your Current Monthly Earnings exceed 80% of Your Indexed Average Monthly Earnings . . . .

*Id.*  The Policy defined "Monthly Benefits" as "a monthly sum payable to You or on Your behalf while You are Disabled."  *Id.* at 4228.

## B.

While covered under the Policy, Safdi underwent surgery for prostate cancer in May 2002.  He experienced several serious complications from this surgery, which forced him to reduce his workload at GCGA significantly, from 75 to 80 hours per week to about 30 to 40 hours per week.  As a result, Safdi lost income due to fewer hours billed.  Initially, GCGA's separate short-term disability plan made up for Safdi's lost income, but after this expired he filed a claim for benefits under the Policy.[1]

---

[1] Although GCGA had purchased disability insurance through Union Central, Safdi's claim was in fact administered by Hartford Life and Accident Insurance Company ("Hartford") under a contract between

Union Central initially declined Safdi's claim on the grounds that he had not shown a sufficient "reduction in income" under his "reduced, yet still full time work schedule." DE 31-3, Admin. R., Page ID # 579. In particular, Safdi did not qualify for Total Disability benefits because, according to Union Central, his work schedule indicated his ability after surgery "to perform the material and substantial duties of [his] Own Occupation on an Active Full-Time basis." *Id.* at 580. Further, Union Central found that Safdi did not qualify for Residual Disability because he had no lost income through 2002.

After an administrative appeal by Safdi, Union Central reversed its decision and in August 2003 began paying him benefits under the Residual Disability option. Union Central reached this result after receiving fuller information on Safdi's earnings in 2002. Based on this new information, Union Central concluded that Safdi had "returned to work on a full time basis" in June 2002 and satisfied all other criteria for Residual Disability benefits. DE 31-4, Admin. R., Page ID # 681. Safdi's initial payment in the fall of 2003 included all amounts owed from the end of the Elimination Period on August 17, 2002.

Union Central continued to pay Safdi under the Residual Disability option through 2007, all the while updating its information and adjusting his monthly payment according to the formulae prescribed in the Policy. In April 2008, Union Central asked Safdi for his tax returns from 2002 to 2007 to verify the proper amount of benefits for those years. Union Central did not receive documentation to its satisfaction and repeatedly requested further information over the next several months. Finally, in November 2008, Union Central sent Safdi a letter claiming that he had been overpaid by nearly half a million dollars from August 2002 until July 2008; the previous calculations of his current-to-historical earnings ratio, Union Central explained, had

---

Hartford and Union Central. We refer to Union Central when discussing the joint decisions of the companies.

been "incorrect based on standard accounting methods and the provisions of your Policy." DE 31-2, Admin. R., Page ID # 509. The letter noted that Safdi's future benefits would be applied against the overpayment.

Safdi filed another administrative appeal after the parties could not reach an agreement. Eventually, Union Central informed Safdi that it was terminating his benefits, effective April 9, 2011. "To continue to receive benefits [he] must be Disabled" under the Policy, Union Central explained, but the information in its possession "show[ed] that [Safdi] worked full time for [GCGA]." DE 31-25, Admin. R., Page ID # 2846. In response, Safdi filed yet another administrative appeal, disputing not only the termination of his benefits but also claiming that Union Central had underpaid him by $316,759.57. When Union Central denied this appeal, Safdi sued for benefits owed under the private right of action created by ERISA, 29 U.S.C. § 1132(a). In its answer, Union Central included a counterclaim against Safdi to recover the alleged overpayments under § 1132(a)(3)(B).

## C.

After discovery before the district court, Safdi moved for summary judgment on Union Central's counterclaim, which was granted. Although Union Central appealed the dismissal of its counterclaim, the parties resolved this claim in mediation after oral argument. Accordingly, we will not discuss Union Central's counterclaim further.

Both parties moved for judgment on Safdi's claim, based on the extensive administrative record. The district court resolved the cross-motions for judgment in two separate orders. In the first order, the district court granted Safdi's motion for judgment and ordered Union Central to reinstate his benefits effective as of April 8, 2011. The court reviewed Union Central's decision *de novo* but also noted that it would reach the same outcome under an arbitrary and capricious

standard. Thereafter, the court conducted several status conferences to discuss how it would resolve the proper calculation of benefits owed. As a result of issues raised in these conferences, the court ordered supplemental briefing on "[t]he effect, if any, [of Safdi]'s Current Monthly Earnings exceed[ing] 80% of his Indexed Average Monthly Earnings." DE 47, Order, Page ID #4484. The new briefing apparently changed the district court's view of the case, for it vacated its previous order on the cross-motions, denied Safdi's motion for judgment, and granted that of Union Central.[2] While reviewing Union Central's decision without deference, the court held that under the "plain language" of the Termination provision, Safdi's "residual disability benefits . . . should have been terminated the first date his Current Monthly Earnings exceeded 80% of his Indexed Average Monthly Earnings." DE 52, Mem. Op. & Order, Page ID # 4557.

The district court disagreed with Safdi's contention that the Recurrent Disability provision "revived his eligibility to receive residual disability benefits." *Id.* at 4553. The court interpreted that provision as reinstating benefits only if "the participant . . . first return[ed] to work *full time*." *Id.* And, the court concluded, "full time" effectively meant the number of hours Safdi himself worked before his surgery, i.e., "working 70-80 hours per week." *Id.* Although Safdi contended that "full time" should be read to mean the 30 hours per week mentioned in the Active Full Employment definition, the district court rejected this interpretation as inconsistent with a fuller reading of the Policy and inconsistent with Safdi's alleged eligibility for Residual Disability benefits. The district court therefore entered judgment for Union Central on Safdi's claim, which Safdi timely appealed. In his brief to this court, Safdi contests only the district court's reading of the Recurrent Disability provision and its interaction with the Termination

---

[2] As part of the same ruling, the district court held, based on Safdi's own argument, that his Current Monthly Earnings exceeded the 80% threshold "on numerous occasions, the earliest being in December 2002." DE 52, Mem. Op. & Order, Page ID # 4551. That determination is not challenged in this appeal.

provision. Notably, he does not contest the district court's finding that he in fact triggered the Termination provision.

## II.

In the district court, the parties disagreed on the procedural posture of the case: Safdi labeled his motion as one for judgment under Rule 52 of the Federal Rules of Civil Procedure; Union Central did not identify a Rule under which it moved; and the district court at times referred to its decision as a grant of summary judgment. Nevertheless, this court typically treats motions for judgment on § 1132(a)(1)(B) claims as governed by the unique framework laid out by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617–20 (6th Cir. 1998) (Gilman, J., concurring).[3]

Safdi's appeal turns entirely on the interpretation of the Policy. We "review the district court's judgment on [Safdi]'s ERISA claim *de novo*, applying the same standard of review to the plan administrator's action as required by the district court." *Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th Cir. 2014) (citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 427 (6th Cir. 2006)). When, as here, "the validity of a claim to benefits under an ERISA plan . . . turn[s] on the interpretation of terms in the plan[,] . . . . a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority . . . to construe the terms of the plan." *Bruch*, 489 U.S. at 115. The administrator's decision does not receive more deferential review unless the plan clearly grants such discretion and that discretion encompasses the power to interpret the particular terms at issue. *Anderson v. Great W. Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir. 1991).

---

[3] In *Wilkins*, Judge Gilman delivered a separate opinion, in which Judge Ryan concurred, which constitutes the opinion of the court with respect to this issue. *See* 150 F.3d at 611.

Here, neither party contends that the Policy explicitly granted Union Central the discretion to interpret the key provisions as it sees fit. Thus, as both parties agree, we give fresh review to the meaning of the Policy provisions. *See Lipker v. AK Steel Corp.*, 698 F.3d 923, 927–28 (6th Cir. 2012).

### III.

"When interpreting ERISA plan provisions, general principles of contract law apply; unambiguous terms are given their 'plain meaning in an ordinary and popular sense.'" *Id.* at 928 (quoting *Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 343 (6th Cir. 2011)). "However, if the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993) (citing *In re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986)). Among these methods is a command that "any ambiguities in the language of the plan be construed strictly against the drafter of the plan." *Regents of Univ. of Mich. v. Emps. of Agency Rent-A-Car Hosp. Ass'n*, 122 F.3d 336, 340 (6th Cir. 1997) (citing *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 307–08 (7th Cir. 1992)). We may also consider "the intent underlying the provision." *Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 692 (6th Cir. 2006) (citing *Bruch*, 489 U.S. at 112–13).

The district court held that a plan participant must return to work full time for the Recurrent Disability provision to become operative. In short, we agree. Specifically, we find that Safdi did not satisfy the Recurrent Disability provision because he cannot show two distinct periods of Residual Disability separated by a return to work on a full-time basis. Based on the

plain meaning of the Policy, for the Recurrent Disability provision to apply, "the participant must first return to work *full time*." DE 52, Mem. Op. & Order, Page ID #4553. In effect, this meant that Safdi had to resume working at pre-disability levels, which for him meant 70 to 80 hours per week. Safdi suggests that the district court drew this requirement from the question, "What Happens If Your Disability Reoccurs After You Return to Work Full Time?" In his words, "the affirmative statement, not the subjunctive question, constitutes the operative policy requirement." CA6 R. 25, First Br. at 28. In fact, the full-time work requirement derives from the first affirmative statement in the provision, which reads, "A Recurrent Disability will be treated as part of a prior Disability if you suffer a subsequent Disability." DE 32-1, Policy, Page ID #4236. This sentence implies the existence of two discrete periods of Disability—both a "prior" period and a "subsequent" period. The Policy defines the general terms "Disability" to include Total, Partial, and Residual Disability, and Safdi does not contend that either the Total or Partial Disability provisions apply or have ever applied. Thus, for the Recurrent Disability provision to have effect in this case, Safdi must have been Residually Disabled at some point, then no longer disabled, and then Residually Disabled again. The necessity of some gap between Disability periods is reinforced by the Recurrent Disability provision's assumption that a participant has "ceased to receive Disability Benefits under this [Policy]." *Id.*

The Policy's definition of Residually Disabled recognizes that gap only if a participant returns to work full time. That provision provides certain benefits to a participant who is "unable to perform the material and substantial duties of [his] Own Occupation on a full-time basis" and is "1. performing at least one of the material duties of [his] Own Occupation . . . on a full-time or part-time basis[,] or 2. performing each of the material duties of [his] Own Occupation . . . on a part-time basis." *Id.* at 4230. When these conditions are read together, as Safdi himself

acknowledges, the Residual Disability provision is meant to pertain to those participants who can perform some of their duties, perhaps on a full-time basis, but cannot perform all duties on a full-time basis. Since a participant who can perform no duties whatsoever is Totally Disabled, a participant is no longer Disabled, in any way, only when he begins performing all of his duties on a full-time basis.

Although the policy does not define the phrase "full-time basis," the ordinary meaning of "full time" is, according to one popular dictionary, "employed for or working the amount of time considered customary or standard." *Webster's Third New International Dictionary* 919 (1981). To an ordinary person, the "customary or standard" amount of time in this context is likely the average hours of gastroenterologists generally.[4] This definition is consistent with the benefits provisions' emphasis on the circumstances and practices of particular medical subspecialities, i.e., one's "Own Occupation." Thus, if a participant works at each of his material duties for the customary amount of time, he is performing them on a full-time basis. But Safdi cannot meet this definition. The record demonstrates that he worked significantly fewer hours than his fellow gastroenterologists at GCGA, and he certainly did not perform surgical duties to the degree of his colleagues.[5] Therefore, if a participant works at each of his material duties for the customary or standard amount of time, he is thus performing them on a full-time basis.

Safdi offers a counter-interpretation for "full-time basis." In his view, "the 80% [of Indexed Average Monthly Earning] threshold is the policy's proxy for 'full time' work." CA6 R. 25, First Br. at 33. As a matter of linguistic interpretation, however, this position is

---

[4] We might also read "customary" as the average hours worked by Safdi himself pre-disability, but he cannot meet that definition, either.

[5] According to Safdi, "I am currently only working approximately 73% of the average of the group and I am not performing any of the duties of night call or week-end call and have decreased my administrative duties." DE 31-6, Admin R., Page ID # 925.

flawed. First, a highly technical earnings ratio unique to the Policy is simply not the ordinary meaning of "full time." *See Lipker*, 698 F.3d at 928. And there is no apparent reason to use "full time" to refer to the 80% threshold in the Residual Disability provision but not in other provisions that discuss earnings.

Safdi further argues that our interpretation of the Residual and Recurrent Disability provisions leads to "illusory" benefits and "irrational results" under the Policy as a whole. CA6 R. 25, First Br. at 30, 33. As happened in Safdi's case, a Disabled participant can trigger the fifth condition in the Termination provision—i.e., his Current Monthly Earnings exceeds 80% of his Indexed Average Monthly Earnings—and suddenly he loses his Monthly Benefit even though he has not returned to work (or full-time work). The upshot of Safdi's argument is that the Recurrent Disability provision simply must counteract the perceived harshness of the Termination provision—whatever the violence to the plain language—because there is no other conceivable basis for relief in the Policy.

As Union Central rightly acknowledges, Safdi's true point of contention here is with the effect of the Termination provision, as it permanently ends benefits. But it is not at all clear that the Recurrent Disability provision is intended to have the particular effect he seeks. *See Citizens Ins. Co. of Am.*, 449 F.3d at 692. Certainly, the Recurrent Disability provision implies some resumption of payments after the participant "ceased to receive Disability Benefits." DE 32-1, Policy, Page ID # 4236. And the requirement of a "subsequent Disability," with no Elimination Period, implies that benefit payments can be restarted if the participant triggers the first sufficient condition in the Termination Provision—that he is "no longer Disabled." *Id.* Even so, it does not follow that Recurrent Disability revives benefits after the fifth Termination condition. The only obvious purpose of Recurrent Disability is to allow a participant to skip a second

Elimination Period, and the consequent wait for benefits, if he recently satisfied a prior Elimination Period. This purpose has no clear relation to revival of benefits after exceeding the 80% threshold. Moreover, if the Recurrent Disability provision were plainly meant to override the Termination provision in this particular respect, one might expect it to state that. Instead, Recurrent Disability does not even mention earnings of any type, much less the particular earnings ratio that Safdi exceeded. Finally, Safdi's interpretation might allow an insured professional to receive substantial monthly benefits even though his annual earnings exceed historical averages, due to large spikes in monthly earnings.

Nor is it obvious that the results of the Policy are irrational, as Safdi claims. The fact that benefits are terminated if a participant is either no longer Disabled or exceeds the earnings threshold suggests that the drafters contemplated that at least some Disabled participants would lose their benefits despite an inability to work full time. Also, the use of Indexed Average Monthly Earnings, rather than Average Monthly Earnings, also ameliorates some of the harshness in the termination condition; the former measure grows by 5% each year, making it increasingly difficult to exceed the earnings ratio. Those who exceed 80% of their Indexed Average Monthly Earnings may very well be on the road to physical or financial recovery, and others earning just below that threshold may in fact exceed their pre-disability earnings while still collecting benefits.

Safdi responds that participants will be victimized by a one-time spike in Current Monthly Earnings. He claims that this is a particularly acute risk under a plan designed for professionals because "[p]ayments from professional services (through insurance reimbursements and governmental benefits) are normally significantly in arrears after provision of the . . . services." CA6 R. 25, First Br. at 7. This risk is not as acute as he claims, however,

since the Elimination Period provides a 90-day window for the arrears to be paid before a participant qualifies for benefits (and thus cannot, presumably, have his benefits terminated). Nonetheless, a large amount of earnings might suddenly materialize even after the participant has satisfied the Elimination Period, but when he is also unable to return to work in any capacity. That may well be true, but it is not obvious that the mere variability in professional earnings inures to the benefit of the insurer more often than not. The amount paid under Residual Disability, for example, increases with a participant's Indexed Average Monthly Earnings, which is itself based on only a certain period of pre-disability income. Thus, the potential variability in professional income makes it possible for the participant's earnings index to be skewed in his favor if arrearages are paid off at that time.

As a general matter, courts are not well equipped to assess the net effects of insurance contracts such as this. Instead, we depend on the plain language of the plan to determine how the parties allocated risks. Safdi does not point to a clear basis in the Policy for reviving his benefits after triggering the Termination provision, and Union Central therefore deserves judgment on his claim.

Therefore, we affirm the district court's judgment with respect to Safdi's claim.