**Milton J. EICHACKER,**
**Plaintiff–Appellant,**

v.

**THE PAUL REVERE LIFE**
**INSURANCE COMPANY,**
**Defendant–Appellee,**

**and**

**Unum Provident, Defendant.**

No. 02–17136.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 4, 2003.

Filed Jan. 20, 2004.

---

Steven J. Parsons, Las Vegas, NV, for the plaintiff-appellant.

Alan D. Cates, Las Vegas, NV, for the plaintiff-appellant.

Patricia K. Norris, Phoenix, AZ, for the defendant-appellee.

Ann–Martha Andrews, Phoenix, AZ, for the defendant-appellee.

Kimberly A. Demarchi, Phoenix, AZ, for the defendant-appellee.

Scott Bales, Phoenix, AZ, for the defendant-appellee.

Before BRIGHT,* D.W. NELSON, and RYMER, Circuit Judges.

D.W. NELSON, Senior Circuit Judge.

Milton Eichacker appeals the district court's grant of summary judgment to Paul Revere Insurance Company. The district court found that Eichacker could not meet the policy's definition of disability because he did not receive a physician's care for the condition causing his disability. Eichacker argues that he did, in fact, receive the physician's care necessary to entitle him to benefits. We find that whether or not Eichacker met the physician's care requirement is a disputed issue of fact that warrants a jury trial. Accordingly, we reverse the grant of summary judgment and remand for a jury trial on the question of whether Eichacker met the policy's definition of disability.

---

* Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

## I. Factual and Procedural History

Milton Eichacker is a lawyer who started his own law practice in Las Vegas, Nevada. On February 13, 1996, he purchased a policy for individual disability insurance from the Paul Revere Life Insurance Company. Under the terms of the policy, Eichacker could receive benefits if he suffered a total or residual disability.

### A. The Terms of Paul Revere's Insurance Policy

The policy defines "total disability" to require that, due to injury or sickness, the claimant is (a) unable to perform the important duties of his or her occupation, and (b) receiving a physician's care.[1] The policy defines "residual disability" to require that the claimant is (a) unable to perform one or more of the important duties of his or her occupation, or unable to perform the important duties of his or her occupation for more than 80% of the time normally required to perform them, and (b) receiving physician's care. The policy defines "physician's care" to mean the regular and personal care of a physician which is, under prevailing medical standards, appropriate for the condition causing the disability.

The policy requires that if a monthly premium payment is late, the insured has a 31–day grace period within which to make the payment. If the premium is not paid within this grace period, the policy lapses. The policy can still be reinstated without a new application if the premium is received 57 days from the original due date.

The policy also provides that 90 days after the claimant becomes disabled, all premiums are waived and the policy and benefits continue as if the premium had been paid. Any premium paid during the

90 days after the onset of the disability will be refunded.

The policy requires that written notice of a claim must be received within 30 days after a covered loss starts, or as soon as is reasonably possible.

Finally, the "time of loss" provision states that "all losses must occur while Your Policy is in force. But, termination of Your Policy will not affect any claim for Total Disability that begins within 30 days of the date of an injury causing such Disability."

### B. Eichacker's Injury and Disability

On September 14, 1996, Eichacker was an innocent bystander in a barroom brawl. When he attempted to stop the fighting, someone hurled a billiard ball at him. It hit him directly between the eyes, causing serious fractures and lacerations that required substantial reconstructive surgery. He received treatment from Dr. Andres Resto, a plastic and reconstructive surgeon, who operated on Eichacker on September 18, 1996, and continued to see him regularly for over a year following the surgery. By November 18, 1996, Dr. Resto stated that Eichacker was sufficiently recovered from his facial surgery to return to his daily activities. At that point, Eichacker attempted to return to work, but he encountered increasing difficulties in accomplishing even the most simple daily tasks. On September 22, 1997, Dr. Resto referred him to a psychiatrist, Dr. Robert Peprah.

On September 26, 1997, Dr. Peprah diagnosed Eichacker with major depression. He found that Eichacker had been depressed for the preceding nine months and had been "completely paralyzed into inaction." His symptoms included sleep disturbance, impaired concentration and

---

**1.** The physician's care provision is subject to a waiver that is not relevant to this case.

thinking ability, feelings of hopelessness, uncontrollable crying episodes, fear of leaving the house, and low energy. By September 1997, his emotional state had become so debilitating that he closed his law office. Over the next several months, his inability to function resulted in problems with the state bar, bankruptcy, and the eventual loss of his home.

## C. The Policy Lapse

Meanwhile, on July 13, 1997, there were not sufficient funds in Eichacker's bank account for Paul Revere to withdraw his monthly premium. On July 21, Paul Revere informed him by letter that he had 31 days from July 13 to pay the premium, after which time his policy would lapse. The letter stated that if the policy lapsed, he would have another 26 days to pay the premium and reinstate the policy without the need to re-apply.

Eichacker sent in a check for the outstanding premium on September 25, 1997. According to the terms of the policy and the letter, this payment was 17 days too late. Paul Revere returned the check, stating that a reinstatement application was required.

On April 10, 1998, Eichacker submitted a claim for disability benefits to Paul Revere. They rejected his claim on March 8, 1999. The rejection letter explained that his policy had lapsed, he had delayed in submitting his claim, and he had further delayed in supplying them with requested information.

Eichacker filed a complaint in federal district court in Nevada. The complaint alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of statutory duties under Nevada's Unfair Insurance Practices Statute. Paul Revere moved for summary judgment on December 13, 2001, and the district court granted it on October 11, 2002.

## II. Standard of Review and Applicable Law

We review the district court's decision to grant summary judgment de novo. *Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir.2003). In considering summary judgment, the threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, we must view the evidence in the light most favorable to the non-moving party. *Liu*, 347 F.3d at 1132.

Because this is a dispute over the interpretation of an insurance contract that comes to our Court under diversity jurisdiction, our analysis is governed by Nevada insurance law. If there are no Nevada Supreme Court decisions directly on point, we "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir.2001), *quoting Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir.1996). We have previously noted that, "Where Nevada law is lacking, its courts have looked to the law of other jurisdictions, particularly California, for guidance." *Mort v. United States*, 86 F.3d 890, 893(9th Cir.1996). Accordingly, since there are no Nevada Supreme Court rulings directly on point in this case, we will look to other jurisdictions, and particularly to California, to inform our analysis.

## III. Discussion

The district court found that, as a matter of law, Eichacker could not qualify as disabled under the terms of the insur-

ance policy because at no point prior to the policy's lapse did he meet the physician's care provision. This provision requires that the claimant receive "the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability." The district court reasoned that Eichacker's disabling condition was depression, and yet he saw only Dr. Resto, a plastic surgeon, while the policy was active. He did not begin seeing a physician for the condition causing his disability until September 26, 1997, over a month after his policy lapsed, when he had his first visit with Dr. Peprah, a psychiatrist. The district court concluded that "The undisputed facts demonstrate that plaintiff was not under a 'Physician's Care' as required under the 'Total Disability' provisions of the policy." *Eichacker v. Paul Revere Ins. Co.*, No. CV–S–99–1586, slip op. at 4(D.Nev. October 11, 2002).

We disagree. Eichacker has provided facts sufficient for a reasonable juror to find that he met the policy's definition of total or residual disability, including the "physician's care" requirement, prior to the lapse of his policy.

Under the terms of the policy, if Eichacker can show that he was totally or residually disabled for 90 days after his injury on September 14, 1996, he is entitled to a waiver of further premium payments. This waiver would relieve him of responsibility for the failure to pay his premium in July 1997, and no policy lapse would have occurred. In order to show that he was totally or residually disabled, he must meet both prongs of the definition of disability: he must have been unable to work (either totally or substantially) and he must have been under a physician's care.

It is uncontested that Eichacker was unable to work between September 14 and November 18, 1996, while he was recovering from his facial surgery. At that point, Dr. Resto said he was sufficiently healed to return to work. However, Eichacker testified in his deposition that he encountered major difficulties upon his attempt to return to work. He found himself unable to meet deadlines, send out his billing statements, follow up on responsibilities, and remember information. He described feeling consistently unable to be an effective lawyer from the beginning of his attempt to return to work until the eventual collapse of his practice.

Based on these facts, a reasonable juror could conclude that, although he returned to work less than 90 days after his accident, he met the policy's definition of "unable to work." Even if his return to work prevents him from meeting the definition of "total disability," [2] the substantial difficulties he encountered on the job certainly could support a jury finding that he was "unable to perform one or more of the important work duties or unable to perform the important work duties for more than 80% of the time normally required to perform them," which would allow him to meet the first prong of the definition of "residual disability."

---

**2.** We do not reach the issue of whether Eichacker can, in fact, meet the first prong of the definition of total disability. Although Nevada has not made an express holding on this issue, many jurisdictions, including California, have held that an attempt to return to work does not necessarily bar a claimant from qualifying for total disability. *See Austero v. Nat'l Cas. Co.*, 84 Cal.App.3d 1, 148 Cal.Rptr. 653, 667 (1978) ("Certainly it would be far beyond the reasonable expectations of an attorney covered by a disability policy, to discover, for instance, if he were still able to return a client's telephone call or Shepardize a case but do nothing else, that he would not be considered totally disabled."). *See also Russell v. Prudential Ins. Co. of Am.*, 437 F.2d 602, 605 (5th Cir.1971); *McMackin v. Great Am. Reserve Ins. Co.*, 22 Cal.App.3d 428, 99 Cal.Rptr. 227, 233 (1971).

The second prong of the definition of total and residual disability—the physician's care requirement—creates a more serious obstacle for Eichacker. There is no question that he received regular care from Dr. Resto during this period. The question is whether this care qualifies as treatment from a physician for the condition causing his disability.

We find that Eichacker has provided sufficient evidence for a reasonable juror to conclude that the facial injuries he sustained on September 14, 1996, were the cause of his depressive condition. The temporal proximity of the accident and the onset of his depression is, in and of itself, strong circumstantial evidence of a causal link. His own statements and those of his treating and examining doctors provide further support for a finding of causation.

In his claim for coverage, he wrote that "due to the nature of the injury and the resultant mental impairment, I have not been able to [do] almost anything on a timely basis." In 1998, Dr. Resto reported that from the time of the surgery until the present, Eichacker's limitations completely barred him from performing his duties as a lawyer. Dr. Peprah testified that Eichacker had been depressed for about nine months preceding the September 1997 visit, but that he probably wasn't even aware of his depression "prior to a month or so before."

This evidence is sufficient to create a disputed matter of fact. The question of whether Eichacker's facial injuries were the condition causing his disabling depression is a question of causation that is more appropriately determined by a jury than by the court. In insurance cases in which causation is disputed, and the causal factors will determine whether or not coverage is required, courts routinely refer the matter to the jury. *See, e.g., Pioneer Chlor Alkali Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 863 F.Supp. 1226, 1231(D.Nev.1994) ("Like proximate cause in general (tort or insurance), the determination of what was the efficient proximate cause is a question for the trier of fact."); *Garvey v. State Farm Fire & Cas. Co.,* 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704, 714 (1989) (where facts were disputed as to whether plaintiffs' losses were due to included or excluded causes under the insurance policy, the court held that "the question of causation is for the jury to decide"); Lee Russ & Thomas Segalia, *Couch on Insurance* § 101:61 (3d ed. 2003) ("In the great majority of cases concerning causation disputes under an insurance policy, the causal relationship of a loss to a particular alleged instrumentality is a question of fact.").

Here, Eichacker has presented evidence that his disability was caused by his facial injuries. If this causal link is established, he would qualify as disabled under the clear terms of the policy. Allowing the jury to make this determination is appropriate given the well-established principle of insurance law that policies are to be interpreted according to their clear terms, as these terms would be understood by the insured. *See Couch on Insurance* § 22:14("The words, 'the contract is to be construed against the insurer' comprise the most familiar expression in the reports of insurance cases."). The Nevada Supreme Court has held that,

> [T]he intention of the parties should control and the terms of the [insurance policy] clause should be taken and understood in their plain, ordinary and popular sense.... In determining the intent of the parties a court should consider all the salient facts. ... If ... there is room for construction or doubt, the benefit of the doubt must be given to the assured.

*Home Indem. Co. v. Desert Palace, Inc.,* 86 Nev. 234, 468 P.2d 19, 21 (1970) (inter-

nal citations and quotations omitted). Here, when Eichacker acquired his insurance policy, he intended to be covered for any disabling condition that resulted from an injury that befell him. He would have reasonably expected the policy to cover disabling depression if the depression did, in fact, result from an injury he suffered during the policy's coverage.

Reserving this matter for the jury is also appropriate given the policy rationales behind the "physician's care" requirement. Many courts have noted that the primary rationale for the physician's care requirement is to assure that the claimant is actually disabled, is not malingering, and is not making a fraudulent claim. *See, e.g., Heller v. Equitable Life Assurance Soc'y of the United States,* 833 F.2d 1253, 1257 (7th Cir.1987); *Russell v. Prudential Ins. Co. of Am.,* 437 F.2d 602, 607 (5th Cir. 1971); *see also Ottey v. Nat'l Cas. Co.,* 192 Misc. 902, 81 N.Y.S.2d 534, 537 (Sup.Ct. 1948) (finding that the purpose of the physician's care requirement is to guard against fraud).

None of these concerns is present here. The testimony of multiple doctors corroborates Eichacker's claim that he was disabled during the period from September 1996 to September 1997, thus, addressing concerns about actual disability and fraudulent claims. There is also no evidence that Eichacker was malingering in seeking care for his disabling condition. He promptly sought treatment for the injuries he suffered from the accident. As soon as his treating doctor recommended that he seek further specialized treatment for his depression, he did so. The fact that his treating physician did not refer him to a specialist until nearly a year into his treatment does not suggest malingering on Ei-

chacker's part. In light of Eichacker's good faith efforts to seek care in the aftermath of the accident, no policy interest would be served by construing the physician's care provision to have the effect of barring his claim for benefits.

Upon first glance, this case appears very similar to two district court cases from Georgia and Indiana, both of which found that claimants suffering from disabling depression were not entitled to coverage during the period in which they failed to meet the policy's "physician's care" requirement. *See Frascona v. Minn. Mut. Life Ins. Co.,* 53 F.Supp.2d 1282(N.D.Ga.1998); *Stinnett v. Northwestern Mut. Life Ins. Co.,* 101 F.Supp.2d 720 (S.D.Ind.2000). Both courts found that the insurance policy had no obligation to cover the plaintiffs during the period in which they delayed in seeking psychiatric treatment.

A closer look reveals that Eichacker's case contains a critical element that was not present in *Frascona* and *Stinnett.* In the latter two cases, the plaintiffs were not receiving any physician's care whatsoever during the period in dispute. Eichacker, on the other hand, was receiving the regular care of a physician while his policy was in effect. If the jury determines that he received care for the condition causing his disability, he meets the unambiguous terms of the policy in a way that the plaintiffs in *Frascona* and *Stinnett* could not possibly demonstrate.

Accordingly, we REVERSE the district court and REMAND the case for a jury determination of whether, for 90 days prior to his policy lapse, Eichacker was (1) unable to work under the policy's definition of total or residual disability and (2) receiving care from Dr. Resto for the condition causing his disability.[3]

REVERSED AND REMANDED.

---

**3.** We do not reach the question of whether Eichacker timely filed his claim. Paul Revere did not argue that Eichacker's delay until

April 1998 should bar his claim. Furthermore, whether or not the delay was "reason-

RYMER, Circuit Judge, dissenting.

I would affirm.

able" under the policy's "notice of loss" provision, which states that written notice of a claim must be received within 30 days after a covered loss starts, or as soon as is reasonably possible, is a question of fact that can be addressed at trial.