**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 20a0047n.06

**Case No. 19-3466**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JESSE BRUTON, | ) | **FILED**<br>Jan 23, 2020<br>DEBORAH S. HUNT, Clerk |
| *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| AMERICAN UNITED LIFE INSURANCE | ) | COURT FOR THE SOUTHERN |
| CORPORATION, | ) | DISTRICT OF OHIO |
| | ) | |
| *Defendant-Appellee*. | ) | |
| | ) | O P I N I O N |

BEFORE: COLE, Chief Judge; SILER and MURPHY, Circuit Judges.

COLE, Chief Judge. Jesse Bruton held a managerial job in the field of information technology when he was afflicted by severe back and leg pain that prevented him from sitting for any extended period of time. Unable to work, he sought benefits from his company's employee disability benefits plan. The plan administrator determined that Bruton was not entitled to long-term disability benefits. Bruton, contending that the plan administrator wrongfully denied his application for benefits, sought relief under the Employee Retirement Income Security Act of 1974 (ERISA). The district court affirmed the determination of the plan administrator. Bruton now appeals. We review the appeal de novo, and for the reasons that follow, we reverse the district court and enter judgment granting Bruton long-term disability benefits.

## I. BACKGROUND

Jesse Bruton was employed starting in July 2006 as a "Technology Development Manager" with Resource Ventures, LTD, a management firm in Columbus, Ohio. Resource Ventures contracted with defendant American United Life Insurance Corporation to provide short-term and long-term disability benefits to its employees. American United, in turn, contracted with a claims administrator, Disability RMS (referred to in briefing and hereafter as DRMS), to manage disability claims. DRMS reviews claims and determines whether an applicant qualifies for benefits under the Resource Ventures employee disability benefits plan (the Plan). DRMS determined that Bruton qualified for short-term disability, but ultimately denied his long-term disability application. He appealed that determination, and DRMS denied the appeal. He then filed this ERISA suit. The district court also determined that he was not eligible for Long Term Disability benefits under the Plan. He now appeals to this court.

### A.    Plan Terminology

To qualify either for short-term or long-term disability, Bruton must establish that he is "totally disabled" under the terms of the Plan. The Plan provides that a person is "totally disabled" if:

> [B]ecause of Injury or Sickness:
>
> > 1) a Person cannot perform the Material and Substantial Duties of his Regular Occupation; and
> >
> > 2) a Person is not working in any occupation; and
> >
> > 3) after the Monthly Benefit has been paid for the number of years stated in the Subscription Agreement, a Person cannot perform the duties of any Gainful Occupation for which he is reasonably fitted by training, education, or experience; and
> >
> > 4) a Person is under the Regular Attendance of a Physician for that Injury or Sickness.

(R. 18 at PageID 81). Relevant here are the first and fourth factors, which the Plan further defines. The term "Regular Occupation" under the Plan "means a person's occupation as it is recognized in the general workplace and according to industry standards. A person's occupation does not mean the specific job tasks he does for a Participating Unit or at a specific location." (*Id.* at PageID 80). The Plan defines "Regular Attendance" to mean that an applicant for benefits:

1) personally visits a Physician as medically required according to standard medical practice, to effectively manage and treat his Disability;

2) is receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work; and

3) is receiving care by a Physician whose specialty or clinical experience is appropriate for the Disability.

(*Id.*). Finally, the Plan provides that an applicant is no longer entitled to benefits when either the person "ceases to be Disabled" or the person is "no longer under the Regular Attendance and care of a Physician." (*Id.* at PageID 103).

## B. Bruton's Occupation

Because the question whether Bruton is "totally disabled" depends on whether Bruton can "perform the Material and Substantial Duties of his Regular Occupation" (R. 18 at PageID 81), the details of Bruton's occupation are relevant to our analysis. According to the job description posted by Resource Ventures, the "Technology Development Manager" role has both technical elements and client-facing elements, including business development. (R. 18-1, PageID 488). The position requires not only "managing the technical project team," but also "interact[ing] with the variety of resources within the organization including application architects, designers, information architects, and client services managers to help insure the successful delivery of the

entire project." (*Id.*). The position also requires travel: up to 20% of working hours might include visits to client sites, as well as conferences, seminars, and training.

### C.    Bruton's Medical History Prior to Initial Application for Disability

Because we review Bruton's application de novo, we surveyed the entirety of his medical history in his claims file. The pertinent history begins when Bruton started to experience back pain in 2007–2008. It was not precipitated by any acute injury. It nevertheless evidently caused Bruton a great deal of suffering: by 2016, he reported "dull and aching" pain that began "below his hips and above his tailbone" and radiated through his right buttock and shot down his leg to his knee. (R. 18-2 at PageID 1346). He attempted to address his pain with medication: first through over-the-counter medications like Tylenol and ibuprofen, then eventually through prescribed drugs like gabapentin and oxycontin. He also attempted other treatments such as physical therapy and transcutaneous electrical nerve stimulation. Neither worked. He developed sciatica and had to stop working in 2014, but evidently was able to return to work after treating the pain with radiofrequency ablation and spinal epidurals.

In January 2015, Bruton received a lumbar MRI, which revealed "mild lower lumbar spondylosis" and "mild acquired central canal stenosis" which had "minimally increased" from an MRI he had had in 2010. (R. 18-1 at PageID 427). It also showed "moderately prominent facet and to a lesser degree ligamentous hypertrophy" with a "broad-based posterior disk protrusion" that was also "not significantly changed" from 2010. (*Id.*)

Bruton's last day of work was February 6, 2015. On February 12, his primary care physician, Dr. Jennifer Briones, provided a statement to DRMS that Bruton suffered from lower back pain with radiation and that his MRI revealed spondylosis and spinal stenosis. She noted that he had attempted treating the back pain through medications, transcutaneous electrical nerve

stimulation, epidural injections, and a facet block injection. Dr. Briones assessed that Bruton had the capacity to perform sedentary activity but could not do work where he would have to bend, twist, be on his feet all day, or sit for more than one hour. She released him to return to work on May 8, 2015.

### D. Application for Short-Term Disability Benefits

On February 13, 2015, Bruton filed an application for short-term disability benefits. A nurse employed by DRMS wrote that, based on Bruton's claim that his lower back pain had worsened over time and his diagnosis of spinal stenosis from the MRI, it would be reasonable to afford him disability benefits while Bruton obtained updated medical information. DRMS ultimately approved benefits through May 11, 2015—the maximum duration for short-term disability benefits—and advised him that he may be eligible for long-term disability benefits.

### E. Treatment During Short-Term Disability Period

During his short-term disability period, Bruton continued seeking medical treatment. The record reflects the following pertinent interactions with medical professionals:

On February 16, 2015, Bruton saw Dr. Rebecca Brightman, a neurosurgeon to whom he had been referred by Dr. Briones. Dr. Brightman wrote a diagnostic letter to Dr. Briones and indicated that she had reviewed Bruton's MRI and diagnosed Bruton with "[m]oderate spinal stenosis." (R. 18-1 at PageID 437). Dr. Brightman's letter concluded: "I thought at this point I might have him see my partner, Dr. [Kirk] Whetstone, who is a medical spine specialist, to see if he could help him, and he is amenable to this." (*Id.*).

Bruton saw Dr. Briones again on March 10, March 16, and March 23, 2016. The exam notes from those visits reveal that Bruton was in severe pain, and that Dr. Briones attempted to manage that pain by changing his medication.

Bruton then received a call from a Managed Disability Analyst affiliated with DRMS on March 20. During that call, Bruton reported that his pain was "about the same" and that physical therapy had not been working. He also indicated that he was "bedridden" without pain medication, but that with the medication he was "out of it" and could not drive. (R. 18-1 at PageID 508).

On March 27, 2015, he saw a physical therapist, Emily Naderer. Bruton told Ms. Naderer that his pain level out of ten was two while at rest, and eight with activity. She formulated a course of physical therapy with the goal of reducing his maximum pain level to two, and assessed that he had "[g]ood rehab potential to reach the established goals." (R. 18-1 at PageID 363).

In April, he once again saw Dr. Briones. This time, Dr. Briones reported that Bruton had "regressed" and that he was "house confined" and "unable to engage in stress situations or engage in interpersonal relations." (R. 18-1 at PageID 501). She therefore concluded that he was not fit for any work activity—even sedentary activity—and that she did not expect "any significant improvement in the future." (*Id.*)

Later in April, he saw Ms. Naderer again. She reported "[n]o improvements in symptoms" since their March 27 appointment and that his maximum tolerance for sitting remained "less than 1 hour," and that his "[p]ain has become so severe that [he] is unable to mentally focus on work duties." (R. 18-1 at PageID 366). Ms. Naderer recommended a trial of "aquatic therapy to determine effectiveness." (*Id.* at PageID 367). But eventually Bruton called Ms. Naderer to cancel any additional physical therapy appointments because he was "in too much pain to tolerate therapy." (*Id.* at PageID 369).

On May 26 and June 24, Bruton saw Dr. Briones again. After those examinations, she concluded that although he had a prescription for oxycodone for pain management, Bruton

"[r]eally struggles with even activities of daily living" and that "[m]inimal activity results in the need to lay down for several hours." (*Id.* at PageID 324, 236).

In July, Dr. Briones submitted a letter to DRMS summarizing Bruton's relevant medical history. That letter provided that physical therapy "appears to be minimally effective" in treating his pain but also noted that he had not yet tried the aquatic therapy that Ms. Naderer had suggested. (*Id.* at PageID 323). Dr. Briones also wrote that Bruton had been referred to Dr. Whetstone but noted that she had no record of the consultation. (*Id.*). She noted further that "[s]ince March of this year his physical exam findings have progressed to demonstrate increasing left lower extremity weakness, namely with hip flexion and toe dorsiflexion. I have encouraged a repeat MRI of the L spine given these findings, however, he has declined due to the cost of the imaging and the unstable nature of his income at this time, despite my recommendations given his changing findings." (*Id.*). Finally, she observed that Bruton "cannot sit or stand beyond 10 minutes without pain," that the pain medication he required "has and does seem to affect his memory and processing, [and] therefore his ability to be productive at work," and that she did not "believe returning to work even in a sedentary capacity at this time is feasible." (*Id.*).

In addition to reviewing his medical records, DRMS continued to conduct interviews with Bruton to assess his health and work capabilities. During a May 8 interview, Bruton reported that he was prevented from performing his work duties due to back pain that had increased drastically in recent years, and that he had been diagnosed with sciatica pain that made it "difficult to be mobile without a lot of pain med[ication]." (*Id.* at PageID 299). Because of these medications, his memory and his work performance suffered. He also reported that he was able to manage most daily activities, but did not like to shower unless his wife was home because he had recently fallen. He could do a few chores, but "nothing sustained," and that although he tried to walk in his yard

"once or twice a day" he "doesn't do much of anything else." (*Id.* at PageID 300–01). During a June 17 interview, Bruton reported that his pain was getting worse, but that he was having difficulties with his insurance in receiving treatment. According to Bruton, his insurance would no longer pay for his oxycontin prescription, nor would it pay for the additional MRI that Dr. Briones had prescribed. He also reported that he "fear[ed] having to spend the rest of his life in bed." (*Id.* at Page ID 356). Finally, during a July 14 interview, a DRMS representative asked Bruton a series of questions about his treatment plan. (*Id.* at PageID 281). When asked why he didn't pursue aquatic therapy, Bruton responded that he believed his medical team thought it was "unlikely to work" and that he therefore "didn't see the reasoning to pay money" for it. (*Id.*). When asked why he had not seen the pain management doctor, Dr. Whetstone, Bruton said that there was a "three month wait" for an appointment. (*Id.*). The DRMS representative observed that Bruton had actually scheduled an appointment with Dr. Whetsone for April 21, but failed to show up at the scheduled time; to that, Bruton responded that he could not pay for the appointment and was not optimistic that a pain management provider would do anything other than give him injections, which had not worked in the past. (*Id.*). Finally, the DRMS representative asked whether Bruton had scheduled the follow-up MRI recommended by Dr. Briones. (*Id.*). He replied that his previous MRI cost $1,200 and that he could not afford another one out of pocket. (*Id.*).

Meanwhile, Nancy Gilpatrick, a Vocational Rehabilitation Counselor employed by DRMS, analyzed Bruton's "Regular Occupation" and determined that the occupation is "highly skilled" and performed at a sedentary level, which includes "[e]xerting up to 10 pounds of force occasionally" and/or a "negligible amount of force frequently." (*Id.* at PageID 345). It also involves "sitting most of the time, but may involve walking or standing for brief periods of time";

"occasional reaching, handling, and fingering"; "frequent talking"; acuity in hearing and vision; "dealing with people"; and "making judgements and decisions." (*Id.*).

In the final days of the claim evaluation process, medical professionals affiliated with DRMS reviewed Bruton's entire claim file. On July 9, nurse Linda Waterman and Dr. Karyn Tocci concluded that the lumbar abnormalities to which Dr. Briones attributed Bruton's pain were "minimal" but "appear[ed] to be progressing" in May and June. (R. 18-2 at PageID 2178). They also highlighted the inconsistency in Bruton's story as to his ability to book an appointment with Dr. Whetstone. (*Id.*). They collectively concluded that Bruton should undergo a functional capacity evaluation and recommended surveillance for "definitive examination of function." (*Id.*) DRMS never ordered a functional capacity evaluation. The next day, Ms. Waterman and Dr. Tocci met with the file manager and a claims analyst. Although they had recommended an in-person evaluation the previous day, on July 10 they reversed course and determined that Bruton was not eligible for long-term disability. This was so, they reasoned, because he had failed to meet with the pain management specialist, failed to pursue aquatic therapy, and failed to undergo a repeat MRI. His treatment was therefore not "most appropriate to maximize medical improvement." (R. 18-1 at PageID 283.)

Shortly after, in a letter dated July 17, 2015, DRMS denied Bruton's claim. DRMS concluded that Bruton did not meet the definition of "Total Disability" under the plan for two reasons. First, it determined that he did not satisfy the requirement of being under the "Regular Attendance" of a physician for his condition because his treatment was not "most appropriate to maximize medical improvement." (R. 18-1 at PageID 307). DRMS based this determination on the following facts: he did not undergo an MRI as recommended by Dr. Briones during his May 26 and June 24 appointments; he did not pursue aquatic therapy as recommended by Ms. Naderer;

and he did not visit Dr. Whetstone, the pain management specialist. Second, it determined that Bruton did not satisfy the requirement of being impaired from his "Regular Occupation which has been determined to be performed in the sedentary physical demand level in the general economy" because he was medically capable of performing sedentary work. (*Id.*).

### F.    Medical Treatment Pending Appeal of Denial of Benefits

Following the initial denial of long-term disability benefits, Bruton continued to seek medical treatment. He was admitted to the hospital on July 19 for "nausea, vomiting, abdominal pain, and altered mental status." (R. 18-1 at PageID 1034). Dr. Chelsey Petz at OhioHealth concluded that these symptoms were likely due to his having stopped taking his oxycodone; she therefore prescribed him medicine to reduce symptoms of opioid withdrawal. The records from that hospital visit also indicated that Bruton had traveled to New Mexico in April and had visited a farm the weekend prior to his hospital admission and "walk[ed] along a stream." (R. 18-1 at PageID 1030.)

He followed up with Dr. Briones in August. She summarized that his hospitalization was due to an ileus resulting from use of prescription opioids and "mental status changes" and continued his prescription of oxycodone with a recommendation to follow-up with a psychiatrist. (*Id.* at PageID 954).

Later in August, Bruton saw Dr. Michael Simek, who had a lengthy discussion with Bruton as to his treatment options for his chronic back pain. Dr. Simek observed that Bruton had had "extensive treatment with trials of medications" as well as "physical therapy, a home exercise program, injections including a previous radiofrequency ablation and epidural steroid injections and has seen a spine surgeon . . . for evaluation. His pain persists nonetheless." (R. 18-1 at PageID

632). He also observed that Bruton's range of motion was "[e]xtremely limited" in his lumbar spine. (*Id.*).

Bruton saw Dr. Briones again in October. She observed that his pain was "poorly controlled on current therapy" and once again recommended that he start aquatic therapy and consider a referral to a pain management specialist. (*Id.* at PageID 624). A nurse practitioner in Dr. Briones's office saw Bruton in January 2016; she advised that he "must" follow up with a pain specialist and referred him to one such specialist, Dr. Dwight Mosley. (*Id.* at PageID 622).

In February, Bruton saw Dr. Mosley. Dr. Mosley concluded after administering physical testing that Bruton did indeed demonstrate axial lower back pain. He also observed that Bruton did not exhibit Waddell signs—a test used to detect malingering. Because more conservative therapies had failed—including ice, heat, opioids, NSAIDs, anti-seizure medications, radiofrequency ablations, and epidural injections—Dr. Mosley determined his "next option is surgery or a spinal cord stimulator." (R. 18-2 at PageID 1350).

### G.      DRMS's Decision Denying Long-Term Disability Benefits on Appeal

DRMS then considered Bruton's appeal with the additional medical and surveillance evidence in his claims file. A nurse affiliated with DRMS reviewed Bruton's file and expressed concern that Bruton had not seen Dr. Whetstone, the pain management specialist. She also expressed the belief that the severity of his reported pain was inconsistent with the MRI findings and with his travels to New Mexico and to a farm.

Next, Dr. Stewart Russell, a physician-consultant certified in occupational medicine hired by DRMS reviewed Bruton's claim. Dr. Russell concluded that "[b]ased on a lack of physical exam findings, coupled with an unchanged MRI evaluation for the last 5 years, there is no condition present that would preclude full-time sedentary activity. [Bruton's] pain complaints are

in excess of what would be expected based on the lack of findings." (R. 18-1 at PageID 681). Dr. Russell also commented that Bruton's opioid prescription would not have long-term cognitive effects that would preclude full-time sedentary work.

On May 26, 2016, DRMS denied the appeal. The denial letter concluded that Bruton was not "totally disabled" under the Plan because he was "capable of performing sedentary physical demand level work." (R. 18-1 at PageID 580).

### H.      Procedural History of Litigation

Bruton then filed a complaint in district court, seeking to appeal DRMS's determination under ERISA. The parties filed cross-motions for judgment on the administrative record. After a de novo review of the record, the district court concluded that Bruton had failed to prove by a preponderance of the evidence that he was "totally disabled" under the terms of the Plan, which required that he be in "Regular Attendance of a Physician" and be unable to "Perform the Material and Substantial Duties of his Regular Occupation." (R. 29 at PageID 2419). The district court opined that Bruton failed to meet the "Regular Attendance" requirement of the Plan for five reasons: First, he failed to follow standard medical practice to manage his pain as he "was prescribed increasing doses of opiate pain medication despite largely normal physical exam findings, with no pain contract or drug testing"; second, he failed to undergo an updated MRI as Dr. Briones recommended; third, he failed to pursue aquatic therapy as recommended by his physical therapist; fourth, he failed to follow through with the referral to the physical medicine and rehabilitation specialist, Dr. Whetstone; and fifth, he had expressed worsening pain complaints even as Dr. Briones prescribed him greater and greater doses of opioids. (R. 29 at PageID 2401–07). The district court also concluded that Bruton failed to established that he could not perform the "Material and Substantial Duties of his Regular Occupation" because there was a "lack of

objective medical and other evidence to support Dr. Briones's opinion that plaintiff is incapable of his regular sedentary employment . . . ." (*Id.* at PageID 2414). Bruton now appeals.

## II. LAW AND ANALYSIS

### A. Standard of Review

To succeed in his claim for disability benefits under ERISA, Bruton must "prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 700–01 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006); *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008)). Bruton must therefore establish by a preponderance of the evidence both that he was in "Regular Attendance of a Physician" for his injury and that he "cannot perform the Material and Substantial Duties of his Regular Occupation." (R. 18 at PageID 81).

The parties agree that, because American United delegated its discretionary authority under the Plan to DRMS, our review is de novo. *Shelby Cty. Health Care Corp. v. Majestic Star Casino, LLC*, 581 F.3d 355, 365 (6th Cir. 2009). Under this standard, "we take a 'fresh look' at the administrative record, . . . giving proper weight to each expert's opinion in accordance with supporting medical tests and underlying objective findings, and 'accord[ing] no deference or presumption of correctness' to the decisions of either the district court or plan administrator." *Javery*, 741 F.3d at 700 (quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998), and *Hoover v. Provident Life & Accident Ins.*, 290 F.3d 801, 809 (6th Cir. 2002)).

### B. The Preponderance of Evidence Supports the Conclusion that Bruton was in "Regular Attendance" of a Physician.

Under the terms of the Plan, to establish "Regular Attendance," an applicant for benefits must show both that he "personally visit[ed] a Physician as medically required according to

standard medical practice, to effectively manage and treat his Disability"; and that he "is receiving the most appropriate treatment and care that will maximize his medical improvement and aid in his return to work." (R. 18 at PageID 80). The parties hold radically different views as to what this requirement obligates an applicant to do. In American United's view, despite the great deal of contact Bruton had with medical professionals, he was not in "Regular Attendance" under the terms of the Plan because he "failed to obtain recommended medical care including a repeat MRI, aqua therapy, and treatment for his chronic pain complaints with pain specialist Dr. Whetstone[.]" (Appellee Br. at p. 27). Bruton argues that he satisfies the requirement because he received medical treatment routinely from competent physicians, and no evidence suggests that those treatments fell below the standard of care. (Appellant Br. at p. 32–33).

Many courts have concluded that a benefits plan clause that obligates a claimant to be under the "regular care" or in "regular attendance" of a physician does not empower an administrator to micromanage a claimant's medical care—instead, it exists merely to prevent malingering and fraud. *Eichacker v. Paul Revere Life Ins.*, 354 F.3d 1142, 1148 (9th Cir. 2004); *Heller v. Equitable Life Assurance Soc'y of U.S.*, 833 F.2d 1253, 1257 (7th Cir. 1987); *Russell v. Prudential Ins. Co. of Am.*, 437 F.2d 602, 607 (5th Cir. 1971); *Sullivan v. N. Am. Accident Ins. Co.*, 150 A.2d 467, 472 (D.C. 1959). But here, unlike in those cases, the provision obligates a claimant to "receiv[e] the most appropriate treatment and care" that is designed to "maximize his medical improvement and aid in his return to work." (R. 18 at PageID 80). Some courts—including one in this circuit— have concluded that when a "regular attendance" requirement specifies that a claimant must receive treatment "appropriate for the condition causing the disability," it implies an affirmative duty on the part of the insured to seek *and accept* care designed to enable the insured to return to his former employment. *See, e.g.*, *Reznick v. Provident Life & Accident Ins. Co.*, 364 F. Supp. 2d

635, 638 (E.D. Mich. 2005) ("A disability policy that requires an insured claiming benefits to be 'under the care and attendance' of a physician cannot reflect an intent of the parties that the insurer will be obligated to pay benefits even if the insured stubbornly refuses the only appropriate 'care' recommended." (citation omitted)); *see also Mack v. Unum Life Ins. Co. of Am.*, 471 F. Supp. 2d 1285, 1290–1291 (S.D. Fla. 2007); *Provident Life & Accident Ins. v. Henry*, 106 F. Supp. 2d 1002, 1004–1005 (C.D. Cal. 2000); *Doe v. Provident Life & Accident Ins.*, No. Civ. A. 96–3951, 1997 WL 799439 at \*4 (E.D. Pa. Dec. 30, 1997). In *Reznick,* we affirmed the district court's decision upholding denial of benefits pursuant to a clause that obligated a patient to receive care "appropriate for the condition causing the disability." *Reznick v. Provident Life & Acc. Ins. Co.*, 181 F. App'x 531, 534–35 (6th Cir. 2006). We reasoned that the clause required that, "to be eligible for benefits under the policy, one must both be totally disabled and receiving care that is appropriate for a person *who is totally disabled*." *Id.* (emphasis in original).

American United argues that Bruton failed to meet the "Regular Attendance" requirement because he "did not obtain a recommended MRI, he did not comply with requests to see pain management specialist Dr. Whetstone, he did not comply with recommendations for aqua therapy, and he was only seeing a counselor and Psychiatrist . . . once per month." (Appellee Br. at p. 24). It seems that, in American United's view, the failure to pursue *any* treatment recommended by *any* medical professional with *any* level of confidence that the treatment would lead to medical improvement puts the applicant outside the realm of "total disability"—even in circumstances when a patient declined treatment that is prohibitively expensive, or experimental, or risky, or painful.

We do not read the "Regular Attendance" requirement so stringently. Instead, we read it as we did in *Reznick*: to be in "Regular Attendance" of a physician under the Plan terms, a patient

must pursue all care that is appropriate for a person who is totally disabled. *Reznick*, 181 F. App'x at 534–35. And the preponderance of evidence suggests that Bruton has done so. Our march through the record reveals that he received extensive treatment from medical professionals from May 2014 to February 2016—including over a dozen visits with his primary care provider and multiple visits with specialists ranging from neurosurgeons to neurologists to physical rehabilitation doctors to pain management doctors. As for the treatments that Bruton declined to pursue—a second MRI, aqua therapy, and an appointment with one specific pain management specialist, Dr. Whetstone—the record offers little to no evidence that Bruton would have improved his health outcomes had he pursued them. Bruton had received an MRI five months prior to Dr. Briones's recommendation and there is no reason to believe that an additional MRI would have meaningfully altered his course of treatment; there is no basis to believe that aquatic therapy would have been more successful than other physical therapy, particularly because his physical therapist recommended it only "to determine effectiveness" (R. 18-1 at PageID 367); and although he failed to see Dr. Whetstone he did see two other pain management specialists. In short, this is not the type of case that concerned the court in *Reznick*, where the insured "stubbornly refuse[d] the *only* appropriate 'care' recommended." 364 F. Supp. 2d at 638 (emphasis added). This is instead a case where the insured made reasonable decisions about his own care and pursued a quantum of treatment one would expect of a person who is totally disabled. The preponderance of evidence therefore supports the conclusion Bruton met the "Regular Attendance" requirement.[1]

---

[1] Because it is not necessary to our holding, we do not address Bruton's alternate claim that DRMS abandoned its "Regular Attendance" argument.

**C. The Preponderance of Evidence Supports the Conclusion that Bruton was Unable to Pursue His "Regular Occupation" Due to Disability.**

The second basis upon which DRMS denied Bruton's claim was his alleged failure to prove that he was unable to perform the Material and Substantial Duties of his Regular Occupation. In reaching this conclusion, it reasoned that his occupation of Technology Development Manager was "performed at a sedentary level"—a conclusion Bruton does not dispute—and that the "available data supports that Mr. Bruton is capable of performing full time sedentary physical demand level work" (R. 18-1 at PageID 580)—a conclusion Bruton disputes ardently.

In reviewing medical evidence in an ERISA case, courts may not conclude that the opinion of treating physicians is entitled to more weight than that of non-treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003). But it is also true that "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. Moreover, a claimant's documented limitations may not simply be dismissed as being "subjective exaggerations," particularly where—as here—the individuals purporting to make that credibility determination did not meet or examine the claimant. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296–97 (6th Cir. 2005).

On review, the preponderance of the evidence in the administrative record supports the conclusion that Bruton is unable to perform his Regular Occupation due to a combination of debilitating back pain as well as the impairing cognitive effect of medication required to treat that back pain. Bruton's subjective level of pain is well-documented: he has been consistent in reporting that his pain is debilitating and increasing. More than that, Bruton's pain is documented objectively. Dr. Briones performed monthly examinations and reviewed MRI results to reach her determination that Bruton was disabled. Dr. Mosley, a specialist in pain medicine, administered a number of tests to detect axial lower back pain, including the Gaenslens test, the Yeomans test,

and the FABER test.[2]  He also searched for Waddell's signs—a group of signs designed to detect whether pain is attributable to a physical ailment.  He detected none of those signs, suggesting that Bruton was not malingering.  It is true that DRMS-affiliated medical professionals reviewed Bruton's claims file and determined that the evidence contained therein was inconsistent with his reported amount of pain.  But there is no basis upon which to elevate the opinions of DRMS-affiliated practitioners who did not observe or physically assess Bruton over those of his treating practitioners.  Indeed, as the Seventh Circuit has observed, when a patient undergoes a host of pain-treatment procedures like Bruton did—including epidurals, spinal ablation, transcutaneous electrical nerve stimulation, multiple consultations with specialists,  physical therapy, and heavy doses of strong drugs—it is highly improbable that he did so "merely in order to strengthen the credibility of [his] complaints of pain and so increase [his] chances of obtaining disability benefits."  *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).  So too  is it improbable that Bruton was a "good enough act[or] to fool a host of doctors and emergency-room personnel into thinking []he suffers extreme pain, and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for h[im] if they thought []he were faking [his] symptoms.  Such an inference would amount to an accusation that the medical workers who treated [Bruton] were behaving unprofessionally."  *Id.*

Moreover, even if Bruton were not precluded from sedentary work based on his physical health alone, DRMS may not ignore the "intellectual aspects" of Bruton's job requirements. *Javery*, 741 F.3d at 702.  It is undisputed that Bruton's position required a high degree of cognitive capability.   DRMS's  own  Vocational  Consultant  described  his  duties  as  "highly  skilled,"

---

[2] All three of these tests are physical maneuvers performed on a patient to evaluate the pathology of the sacroiliac joints.

"requir[ing] frequent talking, hearing and near vision acuity," and involving "directing controlling[,] or planning the activities of others . . . dealing with people, and making judgments and decisions." (R. 18-1 at PageID 345). Dr. Briones concluded that the opioid medications Bruton took were both "require[ed] . . . around the clock to stabilize and assist in managing his pain" and also had the unfortunate effect of negatively impacting "his memory and processing, therefore, his ability to be productive at work." (R. 18-1 at PageID 323). And it was partially on that basis that she concluded that "returning to work even in a sedentary capacity" was not feasible. (*Id.*).

American United urges this court to decline to credit Dr. Briones's assessment, and instead credit the opinion of Dr. Russell, a physician employed by DRMS who reviewed Bruton's medical records. Dr. Russell reasoned that the cognitive effect of opiates is "short-lived, generally less than two weeks, as the patient adjusts to them" and that "[t]he only long-term side effect of opiates is constipation . . . [which] would not preclude full-time sedentary work." (R. 18-1 at PageID 681). But the preponderance of evidence in the record supports the conclusion that Bruton's long-term use of prescription opioids impacted his ability to perform the cognitive tasks of his job. Just as we did in *Wagner v. American United Life Insurance Company*, we now observe that Dr. Russell's credibility determination was "entitled to little weight" because he "did a paper review even though the policy gave American [United] 'the right to have [the claimant] examined' by an independent doctor." 731 F. App'x 495, 497–98 (6th Cir. 2018).

## III.    CONCLUSION

The preponderance of evidence supports the conclusion that Bruton was both in "Regular Attendance" of a physician and that disability prevented him from pursuing his "Regular Occupation." No further fact-finding is necessary. We therefore enter judgment in favor of Bruton

- 19 -

and direct American United to pay Bruton disability benefits through the full 24-month period, subject to any offset from Social Security Disability. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006).